CITY OF YONKERS and Yonkers Community Development Agency, Plaintiffs,

v.

OTIS ELEVATOR COMPANY and United Technologies Corporation, Defendants.

No. 83 Civ. 5944 (JES).

United States District Court, S.D. New York.

Dec. 11, 1986.

Vito J. Cassan, New York City, for plaintiffs.

Wachtell, Lipton, Rosen & Katz, New York City, for defendants; Robert B. Mazur, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge.

### BACKGROUND

Plaintiff City of Yonkers (the "City" or "Yonkers") is a New York municipal corporation, which is a political subdivision of and located in the State of New York. *See* Complaint ("Compl.") at ¶ 1. Plaintiff Yonkers Community Development Agency (the "Agency" or "YCDA") is a New York public benefit corporation, organized for the benefit of, and located in the City. *See id.* For purposes of this action, both plaintiffs stand in essentially the same posture. *See* Yulish Dep. at 8–9, 18; Martinelli Dep. at 4–5; Del Bello Dep. at 9.[1]

Defendant Otis Elevator Company ("Otis") is a New Jersey corporation, with its principal executive offices in Farmington, Connecticut. *See* Compl. at ¶ 3. Otis is a wholly-owned subsidiary of defendant United Technologies Corporation ("United"), a Delaware corporation with its principal place of business in Connecticut. *See id.* at ¶¶ 3–4. In 1975, United acquired a majority of the outstanding stock of Otis, which was merged into United in 1976. *See id.* at ¶ 9.

The facts underlying the instant action are not in substantial dispute. During the 1960's and early 1970's, Otis undertook an

---

1. The depositions of the many people involved in the events preceding and subsequent to the initiation of this action will be referred to by the surname of the deponent, with the page numbers following, *e.g.,* "Doe Dep. at 1."

evaluation of the efficiency and productivity of its North American plants engaged in the production of high-speed gearless elevators. By 1968 or shortly thereafter, Otis had concluded that its Yonkers plant would not be able to meet future production requirements. *See* Defendants' Response to Plaintiffs' 3(g) Stmt. ("Def. 3(g) Resp.") at ¶ 1. Among Otis' considered alternatives were: closing the Yonkers plant and relocating the Yonkers operation to Parsippany, New Jersey, or to some alternate site in Westchester County; expanding and increasing the use of Otis' Canadian and United Kingdom plants to replace the Yonkers operation; and expanding and modernizing the Yonkers plant. *See* Defendants' 3(g) Statement ("Def. 3(g) Stmt.") at ¶ 1; *see also* Plaintiffs' 3(g) Statement ("Pl. 3(g) Stmt.") at ¶ 6; Plaintiffs' Exhibits ("PXs") 1–2, 64–66, 95; Walker Dep. at 33–36, 38–39, 43–52, 56–59, 264–65; Hull Dep. at 4–5, 13–14; Granville Dep. at 10–13, 16–17, 78–79; Sitaras Dep. at 98–100, 153–55, 238–41; Drummond Dep. at 46–47, 49–59, 66, 70–72, 208–10, 226. Yonkers officials were aware of the possibility that Otis might relocate from Yonkers. *See* Del Bello Aff. at ¶ 8; Scher Aff. at ¶ 2.

In exploring the possibility of Otis' remaining in Yonkers, plaintiffs and Otis engaged in discussions regarding Otis' need for space to accommodate an expansion and modernization effort in Yonkers. New York State Urban Development Corporation ("NYSUDC") officials were part of these discussions. *Compare* Def. 3(g) Resp. at ¶ 2 *with* Pl. 3(g) Stmt. at ¶ 2.

In 1969, commissioned by NYSUDC, *see* Def. 3(g) Resp. at ¶ 3, the Charles T. Main Company prepared a report detailing the possible use of urban renewal as a device to effect Otis' expansion and modernization in Yonkers. *See* PX 1 ("the Main Proposal"). While the Main Proposal was rejected by Otis, *see, e.g.,* Pl. 3(g) Stmt. at ¶ 4, the concept of utilizing urban renewal continued to be a focus of the parties. *See id.* at ¶ 5; Def. 3(g) Resp. at ¶ 5.

Otis and Yonkers officials continued to discuss the possibility of Otis' expansion within Yonkers. Meanwhile, Otis continued its search for other sites, and acquired an option to purchase land in Parsippany. *See* Pl. 3(g) Stmt. at ¶ 6; Def. 3(g) Resp. at ¶ 6. During 1970–1971, George Sitaras, Otis' Manager of Facilities, Production Division, prepared the Modified Urban Renewal Proposal ("MUR"), which recommended the use of an urban renewal program to effectuate an eastward expansion of Otis' existing plant—in contrast to the Main Proposal's recommendation for the construction of a new facility on land to the west of the existing plant. *See* Pl. 3(g) Stmt. at ¶ 7; Def. 3(g) Resp. at ¶ 7. No such urban renewal plan existed at the time the MUR was written. *See* Pl. 3(g) Stmt. at ¶ 8. At some time in 1971, Otis told plaintiffs that if an appropriate parcel of land could be made available, Otis would be willing to expand and modernize its Yonkers facilities. *See* Def. 3(g) Resp. at ¶ 10; Pl. 3(g) Stmt. at ¶ 10.

On June 29, 1971, Dr. Seymour Scher, then Yonkers' City Manager, sent a letter to Otis' president, Ralph Weller. *See* PX 5. That letter informed Weller that urban renewal funding was available for the purpose of expanding Otis' Yonkers plant, and stated the general terms and conditions that plaintiff expected would apply in their relationship with Otis. It is noteworthy that nowhere in this letter is there any indication that plaintiffs, or HUD, or any other entity would exact in return for urban renewal funding a commitment from Otis to operate its Yonkers plant for any period of time. *See id.; see also* Scher dep. at 10–13.

On March 7, 1972, Scher wrote a letter to William Granville, Otis' vice-president. *See* DXs 19–20 (the "Yonkers Proposal Letter"). In that letter, Scher advanced on behalf of plaintiffs certain "preliminary language which together with [Otis'] concerns would ultimately be contained in a formal Letter of Intent." *See id.* at 1. It is again noteworthy that the author of that letter stated in his deposition that the letter did not "ask any commitment by Otis to

operate its Yonkers plant for any period of time." *See* Scher Dep. at 20.[2] Morton Yulish, who was at that time Administrator of Yonkers' Department of Development and Executive Director of the Yonkers Urban Renewal Agency, *see* Yulish Dep. at 8–9, also stated at his deposition that there was no such commitment sought in the letter. *See* Yulish Dep. at 21–22.

Upon Otis' receipt of this proposal letter, Otis' representatives, primarily Granville and George J. Sitaras, were in contact with Yonkers officials, primarily Scher and Yulish, concerning the signing of a formal "Letter of Intent." *See, e.g.,* Scher Dep. at 20–21; Yulish Dep. at 24–25, Hull Dep. at 9. On June 6, 1972, Otis and plaintiffs signed a Letter of Intent, dated June 5, 1972. *See* DX 6.[3] This letter clearly states:

> The purpose of this letter and of the commitments set forth herein is the realization of the following *goals:*

> (a) the retention by Otis of its existing usable manufacturing facilities in Yonkers;

> (b) the improvement and expansion of these facilities with the cooperation and assistance of federal, state and local agencies;

> (c) the improvement in the aesthetic appearance of the older section of Yonkers in which these facilities are located; and

> (d) the continuation of existing opportunities for employment and training of the unemployed and the underemployed, such as are now provided by Otis.

*See* DX 6 at 1. (emphasis added).

The "commitments" set forth in the Letter of Intent included various land transactions and site improvement agreements. *See id.* at ¶¶ 2–9. All of these "commitments" were expressly subject to various conditions, also set forth in the Letter of Intent. *See id.* at ¶¶ 2–8, 10–11. Again, nowhere in this Letter of Intent does there appear any "commitment" or "agreement" by Otis to "remain" in Yonkers. *See id.;* Del Bello Dep. at 89; Scher dep. at 23; [4] *see also* Def. 3(g) Stmt. at ¶ 10. This Letter of Intent was never approved by the Yonkers City Council. *See* Ex. N to Mazur Aff. at ¶ 7; Ex. O to Mazur Aff. at 26–27.

At this time, Otis had no intention to leave Yonkers, *see* Def. 3(g) Stmt. at ¶ 11; *see also* Weller Dep. at 104–05, 145–48,

---

**2.** Under the heading of "Goals," the Yonkers Proposal Letter stated: "To retain ... Otis ... in Yonkers and to provide opportunities with Federal financial assistance for the improvement and expansion of same...." Under the heading of "Methodology," Scher proposed that the Yonkers Urban Renewal Agency would apply for HUD funds, and, upon a commitment of at least $7 million, "Otis [would] publicly commit itself to carry out its obligations *as will be specified in the Letter of Intent.*" *See* DXs 19–20 at 1 (emphasis added). Under the heading of "Job Training," Yonkers requested from Otis "a quantifiable commitment for the future which will satisfy both [Yonkers'] desire to significantly decrease Yonkers unemployment and underemployment, especially of minorities...." *See id.* at 3.

**3.** Just prior to this time, Otis had informed union leaders for the work force at its Yonkers plant that, "while there was no commitment" by Otis to stay in Yonkers, given the size of Otis' investment in the expansion and modernization effort, "the Company would probably not make plans concerning a future relocation for less than 20 years." *See* PX 9 at 2–3; Def. 3(g) Stmt. at ¶ 6; *see also* Drummond Dep. at 190–93; Granville Dep. at 103–04. Interestingly, plaintiffs do not dispute this contention, but merely state: "Paragraph 6 of defendants' 3(g) statement is irrelevant to the issues of this litigation. Otis contracted with plaintiffs, not with its unionied [sic] employees." *See* Pl. 3(g) Stmt. at ¶ 35.

**4.** Indeed, at their depositions, neither Alfred Del Bello, then Mayor of the City, who signed the Letter of Intent, nor Scher nor Yulish could recall any discussion between plaintiffs and Otis regarding whether Otis would be required to remain in Yonkers for any period of time. Similarly, none of them could recall any discussion within the Agency as to whether it should seek a firm legal commitment *from Otis to remain* in Yonkers for any period of time. *See* Del Bello Dep. at 18–20; Scher Dep. at 25–26, 27–28, 47; Yulish Dep. at 38, 40–42; *see also* Dunn Dep. at 8, 87–88; Granville Dep. at 120–21, 151, 243–44. Moreover, the Project Director of the Agency itself recognized, in a June 14, 1972 memorandum, that the Letter of Intent lacked any expression of a commitment by Otis to stay in Yonkers. *See* DX 59 (Memo of Brett Auerhan, dated June 14, 1972).

161–62, 238, 240–41; Drummond Dep. at 25; Sitaras Dep. at 188; Del Bello Dep. at 93, but there was no binding agreement to stay, and plaintiffs' own employees and officials proceeded as if there were no such agreement. *See* note 4, *supra; see also* Mazur Reply Aff. at ¶¶ 2–8.[5] Indeed, contrary to the impression created by their

**5.** On July 18, 1973, John R. Nolon, counsel to the Agency, engaged Otis' Senior Attorney in a telephone conversation. Nolon's notes from that conversation state:

> 7/18 TC to Wm. Ross Senior attorney—Otis JRN Told him that we are in our memo of law claiming that the Letter of Intent is not binding because it doesn't meet the S/F, isn't approved by the C. Council & by its terms is only an agreement to agree.
>
> Ross "certainly goes along with our interpretation of the Letter of Intent"—that it was a first step to get us started.

*See* Ex. K to Affidavit of Robert Mazur ("Mazur Aff.").

Indeed, contrary to plaintiffs' assertions in this action, *see* Pl.Memo at 10, the Agency itself did not consider the Letter of Intent to be a binding commitment by Otis to remain in Yonkers. *See* Def. 3(g) Stmt. at ¶¶ 19–20. Yulish swore to an affidavit, also dated July 18, 1973, which was submitted by the Agency in a state court action and which stated in relevant part that "this letter of intent is only one step in a series of steps that will lead to a formal land disposition agreement with Otis ... for the redevelopment of the subject urban renewal land by the Otis Co." *See* Ex. N to Mazur Aff. at ¶ 7; *see also* Def. 3(g) Stmt. at ¶ 21.

In that same state court action, in which it prevailed, *see Yonkers Community Development Agency v. Morris,* 37 N.Y.2d 478, 335 N.E.2d 327, 373 N.Y.S. 112, *appeal dismissed* 423 U.S. 1010, 96 S.Ct. 440, 46 L.Ed.2d 381 (1975), the Agency submitted to the New York Court of Appeals in 1975 a brief which clearly asserts:

> The letter of intent is not a disposition of land. By its very terms, the conveyance of project land is subject to "the negotiation of a contract of sale satisfactory to both parties." *The letter is merely a statement of the intentions of the parties as of June 5, 1972, to agree as to disposition of this land. It is nothing more or less than an agreement to agree, which leaves a number of material items open for further negotiations, and which thus does not satisfy the statute of frauds.*

*See* Ex. O to Mazur Aff. at 26–27 (emphasis added); *see also* Def. 3(g) Stmt. at ¶ 22. It is clear from these circumstances that it was not the intent of any party that the Letter of Intent constitute a binding agreement, and that no party was or should be bound by it. *Cf. Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 261 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83

counsel's arguments on this motion, not even the post-deposition affidavits of various plaintiffs' officials assert that there was ever an objective manifestation of any affirmative agreement by Otis to remain in Yonkers. *See* Del Bello Aff. at ¶ 10; Dunn Aff. at ¶ 9; Scher Aff. at ¶ 5; Yulish Aff. at ¶ 9.[6]

L.Ed.2d 54 (1984) (citing *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969)); *Chromalloy American Corp. v. Universal Housing Systems of America, Inc.,* 495 F.Supp. 544, 550 (S.D.N.Y.1980), *aff'd, mem. op.,* 697 F.2d 289 (2d Cir.1982); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247, 249 (1981).

**6.** At best, these affidavits, which are, in any event, not legally sufficient to oppose a fully supported motion for summary judgment, *see Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 577–78 (2d Cir.1969); *see also Factors, Etc., Inc. v. Pro Arts, Inc.,* 496 F.Supp. 1090, 1103 (S.D.N.Y.1980) ("Triable issues of fact cannot be conjured up merely by substituting an affidavit that attempts to retract or modify prior sworn testimony"), *rev'd on other grounds,* 652 F.2d 278 (2d Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982), establish only that Otis' officials never did anything to dispel the unspoken assumptions and expectations of plaintiffs' officials that Otis would stay in Yonkers.

The October 20, 1977 letter from Otis' Ralph Weller to John M. Oblak, *see* PX 12 ("Weller Ltr.") is not to the contrary, especially when his statement regarding Otis' "promise not to move" is read in context:

> The second important point to emphasize is that *concessions were made by the State of New York and the City of Yonkers to Otis in return for Otis's agreeing to build their new plant in Yonkers instead of a previous plan to locate the new plant in New Jersey.* Until Yonkers made the land east of our old plant available to Otis it was not physically possible to build in Yonkers.... It was this promise not to move—not the hopes and expectations that we expressed for increased employment that was Otis' part of the bargain.
>
> We did express hopes (and several of us did) for increased employment, specifically in remarks made by myself at the dedication ceremony in 1974 [*see* PX 13, 39] of reaching a goal of 2,000 employees by 1980—but they were expressed as hopes and expectations, not promises. These hopes were, naturally, based on similar hopes of increased business activities in the decade of the 80's.

*See* PX 12 (emphasis added). Moreover, Weller's own subjective understanding "that if both parties fulfill all of the terms of this June 5,

On June 27, 1972, the Yonkers City Council designated the Warburton-Woodworth Parcel as an urban renewal area. *See* DX 30; Def. 3(g) Stmt. at ¶ 13. On September 26, 1972, the Yonkers City Council approved an Urban Renewal Plan ("URP" or the "Plan") for NDP area No. 4, *see* DX 22, which included the Warburton-Woodworth Parcel. This Plan, which was prepared by plaintiffs, *see* Martinelli Dep. at 72; Del Bello Dep. at 25; Yulish Dep. at 29–32; Yost Dep. at 9–10, sets forth various "development goals," none of which includes requiring Otis to operate its Yonkers plant for any period of time. *Compare* Def. 3(g) Stmt. at ¶ 14 *with* Pl. 3(g) Stmt. at ¶ 29. Nowhere in the section entitled "Redevelopers Obligations" or in any other section does the URP purport to require Otis to operate its Yonkers plant for any period of time. *Compare* Def. 3(g) Stmt. at ¶ 14 *with* Pl. 3(g) Stmt. at ¶ 29; *see also,* Yulish Dep. at 33–34; Del Bello Dep. at 32. While the Plan did state that the site would "provide a much needed expansion area for the Otis Elevator Company, a long time industry in the city," *see* DX 22 at 3, the URP did not state as a goal or condition that Otis be required to operate its Yonkers plant for any period of time. *See* Del Bello Tr. at 30. HUD also approved the URP. *See* Yulish Dep. at 55; *see also* Scher Dep. at 33.

In June of 1973, Otis received from Yulish drafts of a proposed land disposition agreement and deed of conveyance (indenture), which were sent to Mr. Ross, Otis' counsel; the drafts were prepared by Halprin & Goler, the Agency's land disposition attorneys. *See* DX 23; Yulish Dep. at 84; Del Bello Dep. at 49–50; Martinelli Dep. at 103–04; *compare* Def. 3(g) Stmt. at ¶ 23 *with* Pl. 3(g) Stmt. at ¶ 29.[7] On July 25, 1973, Weller received approval from Otis' board of directors to purchase the Warbur-

ton-Woodworth Parcel. *See* DX 79. Plaintiffs had already obtained approximately $8 million in federal urban renewal funds from HUD and $2 million from New York State for purposes of assembling and clearing the Warburton-Woodworth Parcel; the City contributed approximately $2 million plus portions of certain streets, and the Agency proceeded to assemble and clear the Parcel. *See, e.g.,* DXs 74, 95; Dunn Dep. at 37; *see also* Def. 3(g) Stmt. at ¶ 23.

On or about July 31, 1974, HUD informed the Agency that HUD had approved a revised disposition price of $1,391,000 for the sale of the Parcel to Otis. *See* Def. 3(g) Stmt. at ¶ 24. HUD also agreed that any site improvement costs, approved by HUD to be borne by Otis, could be used by Otis as an offset against the purchase price. *See* DX 10; Yost Dep. at 45, 69; Del Bello Dep. at 16–17. Further drafts of the proposed agreement and indenture were sent by Halprin & Goler to Otis on August 8, 1974. On August 9, 1974, Otis sent a letter to Yost to confirm the $1,391,000 disposition price and that the drafts were satisfactory as to form. *See* DX 9; Def. 3(g) Stmt. at ¶ 26.

On September 11, 1974, the Yonkers City Council unanimously resolved that the proposed agreement, indenture and purchase price were satisfactory, and approved the sale of the Warburton-Woodworth Parcel to Otis. *See* DX 29 at 2–3. The Court notes that the Council's resolution did not state or refer to any understanding or agreement that the approved transaction would obligate Otis to remain in Yonkers and/or to operate its Yonkers plant for any period of time.

On September 13, 1974, the Agency and Otis entered into a "Contract for Sale of

---

1972 letter that Otis' operations would stay in Yonkers," *see* Weller Dep. at 104–05, even if relevant, which it probably is not since it was never communicated to plaintiffs, falls far short of a binding promise to remain in Yonkers for a specified period of time, and, indeed, was never so construed by plaintiffs' officials. *See* notes 4–5 *supra.*

7. The proposed contract(s) was also reviewed by Alphons Yost—Yulish's successor, J. Emmett Casey—Yonkers' City Manager and Chairman of the Agency, who ultimately signed the Agreement, and Yonkers' in-house counsel. *See* Yost Dep. at 12–14; Casey Dep. at 8–12, 19.

Land for Private Redevelopment," *see* DX 12 (the "Land Disposition Agreement" or "LDA"), and the Agency executed an Indenture conveying the Warburton-Woodworth Parcel to Otis. *See* DX 11 (the "Indenture").

The LDA, which was intended by the parties to be an enforceable agreement, *see* Casey Dep. at 9, 14–15; Sitaras Dep. at 183; *see also* Def. 3(g) Stmt. at ¶ 28, is divided into two parts. Part I was prepared by the Agency's attorneys with specific reference to the sale of the Warburton-Woodworth Parcel to Otis; Part II, entitled "Terms and Conditions," is a standard form provided by HUD. *See* Yost Dep. at 13, 15.

At their depositions, neither Casey nor Yost could recall any discussion of "any written commitment by Otis ... to operate its plant for a particular period of time after it was constructed." *See* Casey Dep. at 15; Yost Dep. at 19–20; *see also* DX 2 (Yost memorandum dated 11/9/76, stating, "both parties have indeed complied with the intent of the agreement in every respect").[8] Sections 401 and 402 of the LDA and paragraphs 1–3 of the indenture speak of Otis' right to transfer its interest in the Warburton-Woodworth Parcel and Im-

provements. *See* DX 12 at §§ 401–402; DX 11 at ¶¶ 1–3. Article V of the LDA expressly provides that Otis, as the Redeveloper, "may enter into any agreement to sell, lease, or otherwise transfer ... the Property or any part thereof or interest therein...." *See* DX 12 at § 503(a)(2).[9] The indenture transfers the Parcel to Otis subject to the terms, covenants and conditions of the LDA, and also contemplates the possible sale, lease, or rental of the Parcel by Otis. *See* DX 11 at 4–6.

Pursuant to paragraph 2 of the indenture, and following Otis' completion of the redevelopment of the Parcel as specified in § 305 of the LDA, and the dedication of the plant in September of 1976, *see* Martinelli Dep. at 151–54; DX 51, the Agency issued a Certificate of Completion of Improvements. *See* DX 48 ("CCI"). The CCI was issued on November 3, 1976, in compliance with § 307(a) of Part II of the LDA.

In early 1976, plaintiffs' attorney John Doherty prepared a proposed agreement between plaintiffs and Otis which related to the Letter of Intent, the LDA, the URP, and "any other applicable written and oral agreements." *See* PX 49 at 0001908, ¶ III; Yost Dep. at 21–22; Casey Dep. at 10–11. By memorandum dated November 9, 1976

---

8. Plaintiffs have not effectively controverted defendants' contention that "[n]owhere in the Land Disposition Agreement or Indenture is there any language which can in any way be read to require Otis to operate its Yonkers plant for any period of time." *Compare* Def. 3(g) Stmt. at ¶ 28 *with* Pl. 3(g) Stmt. at ¶ 21. Plaintiffs' conclusory assertions and disputations as set forth in their 3(g) Statement are not specific assertions of material facts as to which there is a genuine issue to be tried, as required by the rules of this Court. *See* Local Rule 3(g)).

Plaintiffs have also failed to factually controvert the following paragraphs in Defendants' 3(g) Statement:

31. Prior to the Land Disposition Agreement and Indenture, Otis did not promise or represent that it would operate its Yonkers plant for any period of time if plaintiffs would transfer the Warburton-Woodworth Parcel to Otis.

32. At the time of the Land Disposition Agreement and Indenture, plaintiffs did not inform Otis that plaintiffs were relying on any promise or representation that Otis would operate its Yonkers plant for any period of time.

The Court further notes that Yost's deposition testimony establishes that he could recall no "mention of any binding commitment on Otis to continue to operate its plant for a particular period of time," and that it was plaintiffs' "*hope,* based upon what we considered to be a project mutually paid for by Yonkers, CDA and Otis and I think it was everyone's *intent or hope* at least, as I said before, to have them [Otis] continue in Yonkers and flourish." *See* Yost Dep. at 105–07 (emphasis added). Indeed, it was Yost's understanding "that the length of time Otis would operate in Yonkers could have been unilaterally determined by Otis." *See id.* at 110.

9. During the course of the negotiations which resulted in the LDA, plaintiffs did not seek to modify the language of the above-referenced sections. *See* Yost Dep. at 15–16; Dunn Dep. at 110–11; Hull Dep. at 19–21. Indeed, Yost, who reviewed the LDA in its draft stages and witnessed the signing of the LDA, testified that he understood that § 503 of the LDA permitted Otis to sell, lease, or otherwise transfer the Warburton-Woodworth Parcel and Improvements. *See* Yost Dep. at 17.

and entitled "Otis Termination Agreement," Yost sent a copy of the proposed agreement to Vincent R. Castaldo, Yonkers City Manager and Chairman of the Agency, with a recommendation that it be executed. *See* DX 2; Yost Dep. at 20–22.[10] By his recommendation that the proposed termination agreement be executed, Yost intended "that no party shall have any claim or action against another party for any obligations arising out of [the] Letter of Intent." *See* Yost Dep. at 26–27, 48. On December 29, 1976, the plaintiffs and Otis executed an agreement, *see* DX 47, which was substantially in the form proposed by plaintiffs. *Compare* DX 47 *with* DX 2 and PX 49; Martinelli Dep. at 160.[11]

Pursuant to the Termination Agreement, Otis paid $63,248.23 to the Agency. *See* Def. 3(g) Stmt. at ¶ 43. It is undisputed that, at the time the Termination Agreement was executed, Otis had no intention to leave Yonkers at any future time. *See id.* at ¶ 44. Moreover, during the period from 1972–1976, plaintiffs never sought a formal commitment from Otis to operate its Yonkers plant for any period of time, nor did plaintiffs' officials discuss among themselves whether to seek such commitment(s). *See id.* at ¶ 45; Del Bello Dep. at 18–20; Scher Dep. at 24–25, 27–28, 45–48; Yulish Dep. at 38, 40–42; Dunn Dep. at 85, 87–88, 91–95, 115; Granville Dep. at 121, 151, 243–44.

From 1976 through 1980–1981, for technological reasons, Otis' Yonkers plant apparently became obsolete, and continued operation of the plant became economically unjustifiable. *See* Def. 3(g) Stmt. at ¶ 47, Faure Dep. at 30–33; Weller Dep. at 205–07. Accordingly, Otis made a public announcement of its determination to cease its Yonkers operations on November 30, 1982. *See* DX 64. Following a series of inflammatory statements and actions by Mayor Martinelli, *see, e.g.,* Mazur Aff. at ¶¶ 2–3, and Exs. A–H thereto, plaintiffs filed their complaint in the instant action.

■ Following extensive discovery, briefing, and arguments, the Court indicated at oral argument, subsequently followed by an Opinion and Order, that the complaint as then drafted, *see* Compl. at ¶ 24, failed to satisfy New York's Statute of Frauds. The complaint was dismissed without prejudice, with leave to re-plead, and plaintiffs' cross-motion for partial summary judgment was denied.[12]

10. Yost's memorandum states:

As can be seen in the body of the agreement, we, as concurred with by the Agency Board, feel that both parties have indeed complied with the intent of the agreement in every respect. The area of concern expressed by certain people and organizations with respect to employment guarantees is addressed in John Doherty's memo on this subject also attached for your information and reference. Otis has indeed provided a facility which can accommodate an employment of some 2,000 persons without that level of employment being a guarantee or a condition within the agreement.

*See* DX 2.

11. The Termination Agreement provides, *inter alia*, that "the Agency, the City and [Otis] do hereby discharge and release each other in regards to any unfulfilled obligations that may still exist under the Letter of Intent, dated June 5, 1972, as amended February 12, 1973, and no party shall have any claim or action against another party for any obligations arising out of said Letter of Intent." *See* DX 47 at ¶ I. The Land Disposition Agreement, and the obligations set forth therein, clearly arise out of the Letter of Intent. In addition, the Termination Agreement provides that Otis has fulfilled all of its obligations set forth in the LDA except those which were "intended to be of a continuing nature." *See id.* at ¶ II(2). This was confirmed by Paragraph III of the Termination Agreement which provides that the "parties are discharged from any further financial obligations" assumed pursuant to the LDA, and the parties "shall have no claim against each other for any further sums of money." *See id.* at ¶ III.

In short, the only obligations assumed by Otis which were not terminated by the Termination Agreement were non-financial obligations of a continuing nature set forth in the LDA. None of these obligations, involve a commitment by Otis to remain in Yonkers. Indeed, the only non-financial obligations of a continuing nature set forth in the LDA relate to Otis' obligations with respect to their employment practices, *i.e.*, obligations relating to job postings and anti-discrimination laws. *See* DX 12 at 17–22.

12. The Court subsequently imposed Rule 11 sanctions against plaintiffs and their counsel for failing to withdraw their concededly groundless

Despite the fact that the dismissal was without prejudice, plaintiffs' counsel filed a Notice of Appeal. In an effort to dispel any doubt that the Opinion and Order dismissing the complaint without prejudice was a non-final, non-appealable Order, the Court convened a Pre-Trial Conference. *See, e.g.,* Transcript of July 9, 1985 Pre-Trial Conference ("7/9/85 PTC Tr.") at 2–6, 72. The Court directed an affidavit to be filed by plaintiffs' counsel with respect to certain issues that the Court believed would assist it in determining whether the entire complaint should be dismissed with prejudice. Upon the filing of that affidavit, and the receipt of defendants' response thereto, the Court deemed the motion for summary judgment to be fully submitted.

## DISCUSSION

As is clear from the recital of facts set forth above, the essential underlying facts of this case are not in serious dispute. There is no doubt that Otis had operated a manufacturing plant in Yonkers since 1853. There is likewise no question that Otis was contemplating a transfer of that manufacturing facility to another location, *i.e.,* Parsippany, New Jersey. It is also clear that the City of Yonkers was anxious to keep that plant in Yonkers and that Otis was amenable to maintaining its presence in Yonkers, assuming that adequate arrangements could be made which would permit it to expand and modernize its plant, which concededly could not be accomplished without effecting certain land transfer arrangements with the plaintiffs. These arrangements were to be part and parcel of an

urban renewal plan approved by HUD that would permit a major portion of that urban renewal to be financed by federal funds.

There is likewise no real dispute that Otis, upon the successful negotiation of satisfactory terms with the plaintiffs, as described above, decided to remain in Yonkers and did not transfer its plant to another location. It thereafter expended approximately $15 million in modernizing and expanding its plant, and $1,390,000 for the Parcel ($539,012.67 in cash, as well as $851,387.33 in site improvement work). *Compare* Def. 3(g) Stmt. at ¶¶ 36–37 (a)–(b) *with* Pl. 3(g) Stmt. at ¶ 23. Otis does not deny that it intended to remain in Yonkers for so long as it was commercially feasible to do so, and did, in fact, remain there until 1982, when, as it asserts, changing technology rendered the continued operation of its Yonkers plant economically unprofitable. *See* Def. 3(g) Stmt. at ¶¶ 35, 44, 47.

The only issue in serious dispute in this litigation is whether or not there was any contract, express or implied, which required or obligated Otis to maintain and operate this plant for a period of time, which plaintiffs allege in their complaint was "a reasonable period of time, *i.e.* not less than sixty years." *See* Compl. at ¶ 24.

■ Plaintiffs now concede that there was no written contract which *in haec verba* imposed that obligation on Otis, and do not even contend that there was any express oral promise to that effect, *see* Affidavit of Vito J. Cassan, dated July 22, 1985 ("Cassan Aff.") at ¶¶ 8–9.[13] Therefore, the Court must first decide whether such an

---

fraud claim until after defendants had filed and served their motion for summary judgment. In the face of the undisputed facts establishing that Otis expended considerable sums to improve its plant and remained for at least nine years, there can be no question that the charge of fraud was improperly brought and required the imposition of Rule 11 sanctions. *See City of Yonkers v. Otis Elevator Co.,* 106 F.R.D. 524, 525–526 (S.D.N.Y. 1985).

13. Plaintiffs' counsel has repeatedly complained about the Court's efforts to have him clarify what plaintiffs claim the contract to be. However, that request was necessary to assist the

Court in resolving the issues raised in plaintiff's complaint and has indeed clarified some aspects of plaintiff's claims. Thus, the affidavit filed in response to the Court's request did enunciate plaintiffs' theory of the alleged contract more clearly than had heretofore been the case. *Compare* Pl.Compl. at ¶ 24 *with* Cassan Aff. Moreover, although plaintiffs' counsel was still unwilling to retreat from his assertion in the complaint that Otis was obligated to remain in Yonkers for at least sixty years, he did unequivocally state for the first time that plaintiffs were not relying on any written or oral express promise of Otis to stay for that or any other definite period of time. *See* Cassan Aff. at ¶¶ 6–9.

obligation may, consistent with the Statute of Frauds, be imposed on Otis.[14] Assuming *arguendo* that the Statute of Frauds does not bar plaintiffs' claim, the Court must then decide whether the facts of this case permit a rational fact finder to infer that Otis agreed to stay in Yonkers for a reasonable period of time, which plaintiffs contend was at least 60 years. *See* Compl. at ¶ 24; Cassan Aff. at ¶¶ 3–5.

For the reasons which follow, the Court concludes that New York's Statute of Frauds applies to the contract alleged in plaintiff's complaint, *see, e.g., Dorman v. Cohen*, 66 A.D.2d 411, 413, 413 N.Y.S.2d 377, 379 (1st Dept.1979), that there is no writing or writings sufficient to satisfy the Statute of Frauds, and that, even assuming *arguendo* that the Statute of Frauds does not bar plaintiffs' claim, the defendants have sustained their burden of demonstrating that no rational finder of fact could find for plaintiffs on the facts of this case, on either a theory of contract (express or implied), equitable estoppel, or unjust enrichment. It follows that summary judgment for defendants must be granted.

1. *The Applicability of the Statute of Frauds*

The pertinent provision of the New York Statute of Frauds provides:

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . .

*See* N.Y. General Obligations Law § 5–701 (McKinney 1978).

In interpreting this provision, the courts have recognized that to some extent the Statute of Frauds is an anachronism, which, rather than preventing frauds and perjuries—which it was at least in part designed to do—very frequently has precisely the opposite effect. *See, e.g., Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 106 (2d Cir.1985); *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 453–55, 472 N.E.2d 992, 993–94, 483 N.Y.S.2d 164, 165–66 (1984). As a consequence, the Statute of Frauds has been strictly construed, and courts have been loath to expand it beyond what its terms strictly require. *See, e.g., Boening, supra*, 63 N.Y.2d at 455, 472 N.E.2d at 994,

---

**14.** Plaintiffs, relying principally on a case decided by the New York Court of Appeals in 1897, *see Matthews v. Matthews*, 154 N.Y. 288, 48 N.E. 531 (1897); *see also Crane v. Powell*, 139 N.Y. 379, 34 N.E. 911 (1893), argue that defendants waived the Statute of Frauds defense because it was not asserted in defendants' answer. The Court is not disposed to accept this argument. Quite aside from the fact that the cases relied upon were decided under concepts of pleading that have since become outmoded, the waiver claim raises a procedural question as to which federal standards are controlling. Under the Federal Rules of Civil Procedure, courts are enjoined to liberally grant amendments to pleadings. *See* Fed.R.Civ.P. 15(a); *see also* Fed. R.Civ.P. 8(c). It would not be consistent with those principles to resolve so important an issue on so technical a ground. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Blossom Farm Products Co. v. Amtraco Commodity Corp.*, 64 F.R.D. 424, 427 (S.D. N.Y.1974) (citing *Roloff v. Arabian American Oil Co.*, 421 F.2d 240 (2d Cir.1970)); *accord, Rogoff v. San Juan Racing Ass'n*, 54 N.Y.2d 883, 885,

429 N.E.2d 418, 419, 444 N.Y.S.2d 911, 912 (1981).

In any event, given the circumstance that plaintiffs' complaint might reasonably have led defendants to believe that plaintiffs were relying on a written contract (*i.e.,* the Letter of Intent and/or the Land Disposition Agreement), this would be an especially inappropriate case to invoke concepts of waiver against the defendants. *Cf. Foman, supra,* 371 U.S. at 182, 83 S.Ct. at 230.

Indeed, as noted above, it was not until plaintiffs' counsel filed his affidavit in July of 1985 that it became unequivocally clear for the first time that plaintiffs were not relying on any express promise, oral or written, by Otis to remain in Yonkers for any specified period of time. *See* Cassan Aff. at ¶¶ 6–9. Moreover, as defendants correctly suggest, on a motion for summary judgment, the Court may properly consider the Statute of Frauds defense even without a formal amendment of the pleadings. *See Blossom Farm Products, supra,* 64 F.R.D. at 427.

483 N.Y.S.2d at 166. Accordingly, the particular provision of the Statute of Frauds at issue here has been held to be inapplicable, where, under any conceivable contingency, however unlikely, the defendant's performance obligation can be discharged in less than a year. *See Ohanian, supra,* 779 F.2d at 106-07; *Boening, supra,* 63 N.Y.2d at 454-55, 472 N.E.2d at 993-94, 483 N.Y.S.2d at 165-66.

Nevertheless, it is equally clear that the Statute of Frauds forbids the imposition of a performance obligation on a defendant necessarily extending beyond one year, in the absence of a writing(s) which sets forth all of the essential terms of the agreement imposing that performance obligation. *See, e.g., Ginsberg Machine Co. v. J & H Label Processing Corp.,* 341 F.2d 825, 827 (2d Cir.1965); *Kobre v. Instrument Systems Corp.,* 54 A.D.2d 625, 626, 387 N.Y.S.2d 617, 618-19 (1st Dept. 1976), *aff'd,* 43 N.Y.2d 862, 374 N.E.2d 131, 403 N.Y.S.2d 220 (1978); *cf. Lauter v. W & J Sloane, Inc.,* 417 F.Supp. 252, 257-60 (S.D.N.Y.1976) (and cases cited therein); *Boening, supra,* 63 N.Y.2d at 456-59, 472 N.E.2d at 994-96, 483 N.Y.S.2d at 166-68; *Dorman, supra,* 66 A.D.2d at 413, 413 N.Y.S.2d at 379. The crucial question is the *"endurance of the defendant's liability." See, e.g., Martocci v. Greater New York Brewery,* 301 N.Y. 57, 62-63, 92 N.E.2d 887, 887-89 (1950) (emphasis added). Thus, where no provision of the agreement alleged permits the defendants to discharge that performance obligation in less than a year, the Statute of Frauds applies. *See id.; Ohanian, supra,* 779 F.2d at 106-07; *cf. Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 837 (2d Cir.1980) (citing *Hausen v. Academy Printing & Specialty Co.,* 34 A.D.2d 792, 793, 311 N.Y.S.2d 613, 614, (2d Dept.1970)); *William J. Conlon & Sons,*

*Inc. v. Wanamaker,* 583 F.Supp. 212, 216 (E.D.N.Y.1984); *Cohen v. Bartgis Bros. Co.,* 264 A.D. 260, 260-61, 35 N.Y.S.2d 206, 208 (1st Dept.1942), *aff'd,* 289 N.Y. 846, 47 N.E.2d 443 (1943); *compare North Shore Bottling Co. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171, 176-77, 239 N.E.2d 189, 191-92, 292 N.Y.S.2d 86, (1968) (contract that continued for more than one year, but was terminable at will of party against whom it was sought to be enforced, is not within Statute of Frauds).[15]

More specifically, where, as here, an alleged contract which is indefinite as to duration does not, by its terms, permit a defendant to discharge its performance obligations in less than one year, the Statute of Frauds requires a writing setting forth the essential terms of the agreement, including the duration of the defendant's performance obligation. *See, e.g., R.G. Group, Inc. v. The Horn & Hardart Co.,* 751 F.2d 69, 78 (2d Cir.1984); *Roulley v. Inex Co.,* 677 F.2d 14, 15 (2d Cir.1982); *Maiman v. Luftek, Inc.,* 88 A.D.2d 946, 947, 451 N.Y.S.2d 183, 184 (2d Dept.1982); *Villano v. G & C Homes, Inc.,* 46 A.D.2d 907, 907, 362 N.Y.S.2d 198, 200 (2d Dept. 1974); *accord Zupan v. Blumberg,* 2 N.Y.2d 547, 550, 141 N.E.2d 819, 820, 161 N.Y.S.2d 428, 429 (1957); *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 54, 57, 110 N.E.2d 551, 553, 555 (1953); *Culotta v. Banana Sales Corp.,* 142 Misc. 149, 149-50, 254 N.Y.S. 84, 86 (Sup.Ct. Monroe Co.1931).

In this case, plaintiffs are unquestionably seeking to impose a performance obligation on defendants that, under plaintiffs' theory of the contract, cannot be discharged in less than a year. Indeed, plaintiffs claim that Otis breached its contract when it moved from Yonkers after nine years. *See* Cassan Aff. at ¶ 8 ("the evidence will be designed to show that a rea-

---

**15.** The Statute of Frauds, of course, is inapplicable where the contract alleged expressly gives each party the right to terminate in less than one year. However, such a provision must be express and not implied. *Cf. Kobre v. Instrument Systems Corp.,* 54 A.D.2d 625, 626, 387 N.Y.S.2d 617, 618 (1st Dept.1976) (citing *Mentz*

*v. Newwitter,* 122 N.Y. 491, 497, 25 N.E. 1044, 1046 (1890)), *aff'd,* 43 N.Y.2d 862, 374 N.E.2d 131, 403 N.Y.S.2d 220 (1978). No claim is made here that either party was expressly afforded any such right to terminate pursuant to the terms of the contract alleged by plaintiffs.

728

sonable period of time is longer than Otis did remain"). In the face of that claim, *see*, *e.g.*, Del Bello Dep. at 89; Dunn Dep. at 62; Scher Dep. at 26; Yulish Dep. at 101; Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion for Summary Judgment and In Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl.Memo") at 10–11, and their continuing assertion that Otis was obligated to remain at least sixty years, *see* Compl. at ¶ 24, it is clear that plaintiffs are contending that Otis could not discharge its performance obligation in less than a year *without a breach. Cf. Boening, supra,* 63 N.Y.2d at 456–57, 472 N.E.2d at 994–95, 483 N.Y.S.2d at 166–67. That being so, the Statute of Frauds applies, and the contract may not be enforced in the absence of a sufficient writing(s). *See id.* (citing *Blake v. Voigt,* 134 N.Y. 69, 72, 31 N.E. 256, 256 (1892)); *see also Ohanian, supra,* 779 F.2d at 107. As the New York Court of Appeals concluded:

> Being terminable only by [a] breach, the agreement alleged in the complaint was not one which by its terms could be *performed* within one year. As such, it came within the ambit of the Statute of Frauds and is void for being unwritten.

*Boening, supra,* 63 N.Y.2d at 458, 472 N.E.2d at 996, 483 N.Y.S.2d at 168 (emphasis in original).

Moreover, the New York courts have been especially sensitive to the need for a writing in a case such as this one, where plaintiffs have allegedly already performed their obligations under the contract (by transferring the land parcels, condemning the property etc.), and at the same time seek to impose a continuing obligation of performance on the defendants. *See North Shore Bottling, supra,* 22 N.Y.2d at 178, 239 N.E.2d at 192, 292 N.Y.S.2d at 91 (1968). As the courts have recognized, such situations are especially fraught with the dangers of perjury, which the Statute of Frauds was designed to prevent. *See, e.g., id.; Boening, supra,* 63 N.Y.2d at 453–54, 472 N.E.2d at 994–95, 483 N.Y.S.2d at 165–66.

■ The Court rejects plaintiffs' argument that the Statute of Frauds can be avoided by the simple expedient of arguing that, there being no express promise to stay for a particular period of time, the law will imply a reasonable period of time, which may be determined by a court or a jury to be less than a year. The Statute of Frauds is designed to insure that a defendant is not subjected to the risk that a jury or a court may find him liable for a contractual obligation which cannot be performed in less than one year, unless that obligation is evidenced by an adequate writing. *See Nifty Foods, supra,* 614 F.2d at 837; *William J. Conlon & Sons, supra,* 583 F.Supp. at 216; *Boening, supra,* 63 N.Y.2d at 453–54, 472 N.E.2d at 993, 483 N.Y.S.2d at 165–66; *Hausen, supra,* 34 A.D.2d at 792, 311 N.Y.S.2d at 614. To allow the plaintiffs to circumvent the Statute of Frauds' writing requirement merely by arguing that the Court or a jury may reject plaintiffs' theory of the case and find that the defendants' contractual liability did not exceed one year, would clearly be inconsistent with the protections that the Statute was designed to afford.

■ In short, the applicability of the Statute of Frauds cannot turn on what a court or jury, after trial, finds a defendant's performance obligation to be. Instead, it requires that the parties' writing(s) establish the duration of that performance obligation, where the contract alleged cannot be performed in less than one year without a breach. *Cf. id.* It follows that plaintiffs may not argue, for the purpose of avoiding the Statute of Frauds, that the court or a jury may find that a reasonable period of time is less than one year, while at the same time arguing, for the purpose of imposing liability upon the defendants, that Otis could not perform its obligations under the alleged contract *without a breach* in less than sixty years. *Cf. Boening, supra,* 63 N.Y.2d at 458, 472 N.E.2d at 996, 483 N.Y.S.2d at 168.

This is, therefore, not a case like those relied upon by plaintiffs, where the existence of some objectively ascertainable circumstance *within the control of the defendant* enabled him to discharge his performance obligations without a breach in less than a year, *e.g.*, an oral employment

contract expressly limited to the duration of defendant's oil operations in Saudi Arabia. *Compare Farmer v. Arabian American Oil Co.,* 277 F.2d 46, 50–51, (2d Cir. 1960), *cert. denied,* 364 U.S. 824, 81 S.Ct. 60, 5 L.Ed.2d 53 (1960); *cf. Nat Nal Service Stations, Inc. v. Wolf,* 304 N.Y. 332, 337, 107 N.E.2d 473, 476 (1952) (by its terms, the contract alleged could conceivably have been performed within one year). In this case, the performance obligation of Otis, according to plaintiffs' theory of the case, is to be measured or determined not by an objective circumstance subject to defendants' control, but rather by what a jury finds the duration of Otis' obligations to be. *See, e.g.,* Pl.Memo at 3, 53–60.

Nor do *Haines v. City of New York,* 41 N.Y.2d 769, 364 N.E.2d 820, 396 N.Y.S.2d 155 (1977); *Barco Urban Renewal Corp. v. Housing Authority, etc.,* 674 F.2d 1001 (3d Cir.1982); or *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917), support plaintiffs' argument that the Statute of Frauds does not apply in this case. In none of those cases did the court imply a reasonable time for performance with respect to a contract silent as to duration in the context of utilizing that concept as a vehicle for avoiding the Statute of Frauds. Indeed, in none of these cases was the Statute of Frauds even raised as an issue, and nothing in those cases remotely suggests that a performance obligation exceeding one year may be imposed on a defendant absent a writing, merely because of the possibility that a judge or jury may reject plaintiffs' claim that a reasonable time was more than a year.

Indeed, it is significant that in *Haines,* there was a written contract which had been performed for over fifty years, and which obligated the City of New York to maintain and extend sewer lines. The only issue was whether the city's obligation was perpetual and whether the city was obliged to expand its treatment facilities by building a new sewage treatment plant or whether, as the city claimed, the absence of a provision as to duration enabled the city to terminate at will. *See Haines, supra,* 41 N.Y.2d at 772, 364 N.E.2d at 882, 396 N.Y.S.2d at 157. The *Haines* court rejected both the claim of perpetuality and the claim that the city was obligated to expand its facilities. *See id.,* 41 N.Y.2d at 773, 364 N.E.2d at 823, 396 N.Y.S.2d at 157. However, the *Haines* court also held that the contract was not terminable at will, because the law would and could imply a reasonable time for performance of the city's obligations under the agreement, which time was found to be for as long as the city needed the water which was being treated by the sewage treatment plant already in existence. *See id.,* 41 N.Y.2d at 772–73, 364 N.E.2d at 822–33, 396 N.Y.S.2d at 157–58.

Therefore, in *Haines,* it was clear that to regard a contract designed to secure treatment of water supplied to the city, which had been performed on both sides for over fifty years, as terminable at will, merely because of the absence of a time provision, would have frustrated the manifest intent of the parties and deprived the contract of its intended commercial effect. *See id.,* 41 N.Y.2d at 772–73, 364 N.E.2d at 822–23, 396 N.Y.S.2d at 157–58.

Similar situations were presented in *Barco Urban Renewal Corp. v. Housing Authority, etc.,* 674 F.2d 1001 (3d Cir.1982) and *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917). In *Barco,* the right of first refusal concededly conferred by the contract would have been bereft of commercial significance if it were to be regarded as terminable at will. *See Barco, supra,* 674 F.2d at 1010. Consequently, the Court found that that right should exist for a commercially reasonable time. *See id.* at 1010–11. Similarly, in *Wood,* where it was clear that the contract intended to confer an exclusive distributorship on plaintiff, the court refused to find that the contract was illusory merely because the plaintiff's obligation of performance, which could reasonably be implied, was not expressly set forth. *See Wood,*

*supra,* 222 N.Y. at 91–92, 118 N.E. at 214–15.

In the instant case, as defendants quite correctly assert, the imposition of an obligation on Otis to stay in Yonkers for sixty years as an implied term of the agreement is not essential to give commercial effect to either the Letter of Intent or the Land Disposition Agreement. *Compare Barco, supra,* 647 F.2d at 1010; *Haines, supra,* 41 N.Y.2d at 773, 396 N.Y.S.2d 155, 364 N.E.2d 820; *Wood, supra,* 222 N.Y. 91–92, 118 N.E. 214, and, in fact, is in conflict with the plain language of the Letter of Intent and the LDA. *See* Defendants' Memorandum of Law In Response to the July 22, 1985 Affidavit and July 30, 1985 Letter of Vito J. Cassan, Esq. ("Def.Resp.Mem.") at 13–15.

■ The Court therefore concludes that the contract sued upon is within the Statute of Frauds and may not be enforced absent a sufficient writing(s).

### 2. *The Sufficiency of the Writing(s)*

### (a) *Duration As An Essential Term of the Alleged Contract*

■ It is clear under New York law that the writing or writings relied upon to satisfy the Statute of Frauds must contain all of the essential terms of the contract alleged. *See Ginsberg, supra,* 341 F.2d at 828 (citing *Drake v. Seaman,* 27 Hun 63, *aff'd,* 97 N.Y. 230 (1884)). The memorandum required by the statute "must be such that when it is produced in evidence it will inform the court or jury of the essential facts set forth in the pleading, and which go to make a valid contract." *Dorman, supra,* 66 A.D.2d at 414, 413 N.Y.S.2d at 379 (citing 56 N.Y.Jur.Statute of Frauds

§ 164; *Mentz v. Newwitter,* 122 N.Y. 491, 498, 25 N.E. 1044, 1046 (1890)). Although parol evidence is admissible to show that the various writings relied upon are connected to each other, *see Crabtree, supra,* 305 N.Y. at 55–56, 110 N.E.2d at 554, it is not admissible to prove an essential term of the contract that is not reflected in the writings. *See id.* at 55–56, 110 N.E. at 554; *see also, Dorman, supra,* 66 A.D.2d at 418, 413 N.Y.S.2d at 382.

■ It is also clear that what is an essential term for purposes of the Statute of Frauds is a flexible concept that depends upon whether that term seriously affects the rights and obligations of the parties, and whether there is a significant evidentiary dispute as to whether the parties agreed on that term. *See, e.g., Ginsberg, supra,* 341 F.2d at 828;[16] *see also Dorman,* 66 A.D.2d at 416, 413 N.Y.S.2d at 381 (and cases cited therein). In this case, there can be little question that whether or not Otis bound itself to stay in Yonkers for any period of time or obligated itself to stay sixty years is the only area of dispute, and therefore unquestionably substantially affects the rights of the parties. While the defendants argue, and the Court agrees, that there is no competent proof to support that claim, *see* Part 3 *infra,* there can be no question that that issue is seriously disputed. The Court therefore concludes that Otis' alleged agreement to stay for a reasonable period of time, or at least sixty years, as plaintiffs claim, is an essential term that must be reflected in an adequate writing. *See Ginsberg, supra,* 341 F.2d at 828; *cf. Dorman, supra,* 66 A.D.2d at 416, 413 N.Y.S.2d at 381 (and cases cited therein).[17]

**16.** While *Ginsberg* was criticized by the New York Court of Appeals for its finding that the contract at issue in that case could not be performed in a year and was thus within the Statute, *see North Shore, supra,* 22 N.Y.2d at 179 n. 4, 239 N.E.2d at 193, 292 N.Y.S.2d at 92, its holding with respect to what terms must be reflected in a writing to satisfy the Statute of Frauds has not been challenged in any way. Indeed, subsequent New York cases have cited this aspect of *Ginsberg* with approval. *See, e.g.,*

*Dorman, supra,* 66 A.D.2d at 413–14, 413 N.Y. S.2d at 381.

**17.** Plaintiffs cannot avoid this requirement by conceding that there was no express oral or written promise to stay for a definite period of time. The protections afforded by the Statute of Frauds would be hollow indeed if plaintiffs could vitiate that protection by merely asserting that the law fixes the duration of Otis' alleged performance obligation, and that, therefore, there is no need for the writings to reflect Otis'

## (b) *Lack of A Sufficient Writing(s) to Support Plaintiffs' Contract Claim*

The Court has reviewed all of the writings relied on by plaintiffs, *see, e.g.,* Cassan Aff. at ¶ 10(a)–(j), and concludes that none of these writings is sufficient, taken singly or in combination, to support the long-standing obligation to remain in Yonkers which plaintiffs claim Otis assumed. In fact, in none of them is there any support for a commitment to remain in Yonkers for *any period* (except as required by the Land Disposition Agreement, an obligation that has been concededly discharged, *see* note 11, *supra*), much less a reasonable period of time, and certainly nothing that would support a binding commitment by Otis to remain in Yonkers for sixty years. Indeed, a commitment of that magnitude, *i.e.,* to maintain a plant in Yonkers for sixty years, regardless of the commercial viability of such a presence, is so extraordinary that it borders on the irrational to expect that it would have been assumed by any corporation without some writing. No such writing exists.

It is indeed significant that while the writings relied on by plaintiffs are replete with expressions of good will, hope, expectations and good intentions, none contained any binding commitment by Otis to remain in Yonkers for any period of time. Similarly, the deposition testimony of all of those who were directly involved with both the Letter of Intent and the Land Disposition Agreement clearly reflects that, while everyone hoped that Otis would remain in Yonkers for a long period of time—since it was clear that that was everyone's, including Otis', objective—*see, e.g.,* Def. 3(g) Stmt. at ¶¶ 35, 44, 47, the issue of Otis' making a binding agreement to stay was not even raised or discussed. Moreover, the testimony of defendants' witnesses that, had it been raised, such a proposal would have been rejected, remains uncontradicted.[18]

The only document colorably relevant to plaintiffs' claim is PX 12, wherein Mr. Weller, an Otis representative, makes reference to a "promise not to move."[19] How-

---

obligation to remain in Yonkers for a period of sixty years.

In any event, this is not a case where the writings do not deal at all with Otis' obligations to remain in Yonkers. Indeed, as defendants argue, Otis committed itself, in the Land Disposition Agreement and Indenture, *see* DXs 12, 11, to stay in Yonkers for at least as long as it would take to discharge its obligations under that agreement. *See, e.g.,* Def.Resp.Memo at 13. Moreover, Otis restricted its right to transfer the property received from plaintiffs until those obligations had been discharged. *See* DX 12 at § 503. These express, written contractual provisions negate any rational argument that the duration of Otis' obligations was not considered by the parties, and that it therefore would not be reasonable to expect that an agreement to stay for a reasonable time, *i.e.* sixty years, would not be reflected somewhere in a pertinent writing. Thus, plaintiffs' claim of a binding agreement by Otis to stay for sixty years is arguably inconsistent with and contradicts the writings that do exist with respect to that issue. *Cf. Miller v. Schloss,* 218 N.Y. 400, 406–07, 113 N.E. 337, 403–4 (1916).

**18.** In fact, the *lack* of a binding commitment by Otis was the subject of discussion with union officials representing Otis employees. *See* PX 9, at 2–3. It was also the subject of comment by City employees. *See, e.g.,* DX 59, Ex. K to Mazur Aff.; Ex. N to Mazur Aff. at ¶ 7.

**19.** The Letter of Intent clearly does not satisfy the Statute of Frauds. It sets forth no binding agreement by Otis to stay in Yonkers. Indeed, it is, as plaintiffs argued to the state court, *see* Ex. O to Mazur Aff. at 26–27, at best an agreement to agree, and expressly reflects that any land transfers were to be subject to a formal agreement to be subsequently negotiated by the parties, which, of course, proved to be the Land Disposition Agreement.

Moreover, the Letter of Intent unequivocally states that retaining Otis in Yonkers was a *"goal,"* which is plainly inconsistent with any notion that Otis had contractually obligated itself to stay in Yonkers. The Court, therefore, cannot accept plaintiffs' argument that parol evidence would be properly admissible to establish that the parties understood the word "goal" to be synonymous with a binding commitment, a position, incidentally, clearly inconsistent with the argument which plaintiffs urged upon the state court. *Cf. Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980); *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.,* 558 F.2d 1113, 1114–15 (2d Cir.1977); *Ruskay v. Waddell,* 552 F.2d 392, 395–96 (2d Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *see also* Def.Memo at 37 n. * (and cases cited therein). This is especially true since, as has been noted, parol evidence is not permissible to explain, amplify or contradict a memorandum relied on to satisfy the Statute of Frauds.

ever, a reading of that statement in context makes it unquestionably clear that that statement refers not to any binding commitment to remain in Yonkers for a specified period of time, but rather to Otis' decision not to relocate, and to Otis' agreement to build its new plant in Yonkers, rather than in New Jersey as previously planned. Otis concededly honored that commitment. It is therefore not colorably sufficient to support a binding commitment to remain in Yonkers for sixty years.

In short, an agreement not to move is not synonymous with a binding agreement to stay, especially a binding commitment to stay for a period of sixty years regardless of what business considerations might in the future dictate a relocation of the plant.

3. *Plaintiffs' Failure To Rebut Defendants' Showing That There Are No Genuine Issues of Material Fact To Be Tried*

The Supreme Court has recently reemphasized that a motion for summary judgment must be granted where, taking the plaintiff's evidence in its most favorable light, and affording plaintiff the benefit of every reasonable inference,[20] no rational jury could find in plaintiff's favor. Thus, in any case in which the Court would be constrained to grant a motion for a directed verdict in defendant's favor, summary judgment is appropriate, because in that situation there is no genuine issue of fact for a jury to try. *See Anderson v. Liberty Lobby, Inc.,* — U.S. ——, ——, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). While the Supreme Court first reemphasized that rule in an antitrust case in its most recent term, *see Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.,* — U.S. ——, ——, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), it is clear that that standard has general applicability in

all civil cases. *See Anderson, supra,* — U.S. at ——, 106 S.Ct. at 2511, 2514; *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

Tested by those precepts, the defendants' motion for summary judgment must be granted. As noted above, after extensive discovery, the deposition testimony of plaintiffs' own witnesses clearly established that Otis never promised to remain in Yonkers; that it never bound itself to stay in Yonkers for any specified period of time; that the issue was never even discussed; and that everyone representing the plaintiffs in connection with the negotiations with Otis never understood that Otis had contractually obligated itself to stay in Yonkers for any period of time, and certainly not sixty years, as alleged in the complaint.

Moreover, the Otis witnesses corroborated this testimony, and further testified that, had that demand been made, Otis would have refused to accept it. *See* Granville Dep. at 121–22; Hull Dep. at 12, 29–30. That testimony remains, in essence, uncontroverted. *See* Def. 3(g) Stmt. at ¶ 46. Indeed, in the only instance in which the issue did arise, Otis made it unquestionably clear to representatives of its employees that it was not obliged or bound to remain in Yonkers. *See* PX 9 at 2–3. In addition, as noted above, the written evidence, *e.g.,* the Letter of Intent, the pertinent correspondence, the Land Disposition Agreement, and the Termination Agreement, do not support the existence of any such commitment, and indeed refute that claim.

Plaintiffs, in the post-deposition affidavits submitted by their witnesses in opposition to defendant's motion for summary

---

In any event, even if parol evidence were considered, there is no proof that any party objectively manifested its understanding that Otis was obliged to remain in Yonkers for a period of sixty years. *See* Part 3, *infra; see generally* Cassan Aff. at ¶¶ 6–9. Yet it is the objective manifestation of intent that is dispositive in a contract case, not the unexpressed subjective intent or understanding of the parties. *See* note 21, *infra* (and cases cited therein).

**20.** Of course, the Court is not to weigh the evidence as a finder of fact. *See, e.g., Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11–12 (2d Cir.1986). Its sole function is to determine the legal sufficiency of plaintiffs' proof. *See Anderson v. Liberty Lobby, Inc.,* — U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Perma Research, supra,* 410 F.2d at 578.

judgment, seek to avoid the clear thrust of the deposition testimony of their own witnesses. Those affidavits, however, are not sufficient to defeat defendants' motion for summary judgment.

In the first place, those affidavits cannot properly negate the prior deposition testimony, and it is therefore doubtful that they should or can be afforded any weight. *See* note 6, *supra* (and cases cited therein). Moreover, even assuming *arguendo* that they may properly be considered, they do not set forth any competent proof that Otis made any express promise to stay in Yonkers, much less any agreement to stay in Yonkers for sixty years. At best, they constitute conclusory statements of what these witnesses subjectively may have understood, or hoped, or expected. They are not, therefore, legally sufficient to establish the contractual obligations set forth in plaintiffs' complaint.[21]

It should also be noted that there is a serious legal question as to whether any parol evidence may properly be considered. Defendants strongly argue that, on plaintiffs' theory of the case, any binding agreement by Otis to stay in Yonkers must necessarily arise out of the Letter of Intent, which was clearly not intended to be a binding agreement, and/or the Land Disposition Agreement. *See* Def.Memo at 36–50. Defendants further contend that since that 53–page Land Disposition Agreement and the accompanying Indenture, allegedly drafted by plaintiffs, set forth fully the rights and obligations of the parties (which obligations were extinguished by the clear and unambiguous terms of the Termination Agreement), parol evidence may not be permitted to contradict its terms. The Court

agrees with these arguments. *Cf. Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir.1980); *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1114 (2d Cir.1977).

This is especially true because the Land Disposition Agreement does deal with the duration of Otis' obligation of performance in that it contains provisions referring to when and how Otis may subsequently transfer the land, and it did require Otis to stay in Yonkers for at least as long as it took to make the improvements which Otis agreed to make. However, even assuming *arguendo* that parol evidence may properly be considered at trial, the evidence relied on by plaintiffs is simply legally insufficient to sustain a verdict in plaintiffs' favor on the contract claim.[22]

Indeed, plaintiffs' breach of contract claim consists essentially of an invitation to the Court, and perhaps a jury, to conclude that Otis must have agreed to remain in Yonkers, because that is what plaintiffs were seeking to achieve by the land transfers involved. *See* Pl.Memo at 37–52. However, it was incumbent upon plaintiffs to negotiate that contractual agreement with Otis, and to obtain from Otis a binding commitment to remain in Yonkers. Having failed to do so, they may not now properly seek to have this Court make a contract that the parties could or should have made, but failed to make, for themselves. As defendants correctly assert, the concept of a contract implied in fact or law does not permit the Court to make contracts by judicial fiat. *See, e.g., Neuman v. Pike*, 591 F.2d 191, 194–95 (2d

---

**21.** As noted above, there is no proof that Otis ever objectively manifested its intent to stay in Yonkers for sixty years. Indeed, plaintiffs now concede there was never any express promise, oral or written, by Otis that they would remain in Yonkers for a specified time. *See* Cassan Aff. at ¶ 6–9. Given this failure to demonstrate the requisite objective manifestation of the parties' intent to enter into the agreement they allege, New York law dictates that plaintiffs' contract claim cannot be legally sustained. *See, e.g., Manhattan Theatre Club, Inc. v. Bohemian Benevolent and Literary Ass'n.*, 64 N.Y.2d 1069, 479

N.E.2d 222, 489 N.Y.S.2d 877 (1985); *Hotchkiss v. National City Bank*, 200 Fed. 287, 293 (S.D.N.Y.1911), *aff'd*, 201 Fed. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913).

**22.** The Weller memorandum, *see* PX 12, is clearly insufficient for that purpose. Taking that memorandum in context, it is not legally sufficient to support a jury finding that Otis contractually obligated itself to stay in Yonkers for sixty years. *See* note 6, *supra*.

Cir.1979); *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 69, 385 N.E.2d 566, 570, 412 N.Y.S.2d 827, 831 (1978); *accord* 5/8/84 Tr. at 22.

▆▆ Nor may a jury properly infer, from the transfer of the land or from Otis' performance of its obligations with respect to improving the land, that Otis made an oral promise to remain in Yonkers. Both the transfer of the land and the improvements made with respect to the Yonkers properties constituted performance under the Land Disposition Agreement, and, therefore, were not unequivocally referable to any oral promise by defendants to remain in Yonkers for sixty years. Alleged performance may be sufficient to establish an oral contract only when the performance is unequivocally referable to the alleged oral contract. *Cf. Mauala v. Milford Management Corp.*, 559 F.Supp. 1000, 1004 (S.D.N.Y.1983); *Chromalloy American Corp. v. Universal Housing Systems of America, Inc.*, 495 F.Supp. 544, 551–52, *aff'd mem. op.*, 697 F.2d 289 (2d Cir.1982); *Philo Smith & Co., Inc. v. USLIFE Corp.*, 420 F.Supp. 1266, 1271–72 (S.D.N.Y.1976), *aff'd*, 554 F.2d 34 (2d Cir.1977); *Ripple's of Clearview, Inc. v. LeHavre Associates*, 88 A.D.2d 120, 123, 452 N.Y.S.2d 447, 449 (2d Dept.1982).

The claim of unjust enrichment stands in no better posture. There is no competent, legally sufficient proof that defendant was unjustly enriched. The claim of unjust enrichment is based entirely on the fact that Otis received certain land parcels pursuant to the Land Disposition Agreement, a small part of which were funded by the plaintiffs, but the major part of which were financed with federal funds. However, independent HUD appraisals, *see* DX 86 at 1, Del Bello Dep. at 16–17; Martinelli Dep. at 100; Yulish Dep. at 73–74; Yost Dep. at 44–45, confirmed that Yonkers received fair value for this land, *compare* Def 3(g) Stmt. at ¶ 36 *with* Pl. 3(g) Stmt. at ¶ 23,

which consisted of $539,012.67 in cash, plus Otis' agreement to make certain improvements and to expend certain funds in connection therewith, which obligations Otis performed at a cost of $851,387.33. Plaintiffs also received $63,248.23 in cash from Otis pursuant to the Termination Agreement, and Otis' expended $14 million to renovate and expand its Yonkers facility. Yonkers also received valuable improvements to City services and facilities, as well as the opportunity to purchase from Otis certain waterfront land parcels. *See, e.g.*, Del Bello Dep. at 25–30, 52–54, 78–82; Dunn Dep. at 96–99; Yulish Dep. at 117–18; Martinelli Dep. at 118–20; DXs 30, 62.

▆▆ Moreover, the Court may not properly assess with hindsight the relative merits of who got the better of the bargain. Where parties bargain at arms length and reach express contractual agreements, and where both parties are commercial equals, the Court may not permit recovery on a theory of unjust enrichment or quasi contract based upon an *ex post facto* judicial analysis of who profited the most from the transactions. Yet, that is the thrust of the argument made by plaintiffs, to which defendants have dutifully responded. *Compare* Compl. at ¶ 23 *and* Cassan Aff. at ¶ 11; Pl. Memo at 3 *with* Def.Reply Memo at 13–15 *and* Def.Resp.Memo at 16–23.

In any event, the Termination Agreement unquestionably settled and resolved all financial obligations between the parties arising out of the Letter of Intent and/or the Land Disposition Agreement. *See* DX 48; Def. 3(g) Stmt. at ¶ 39; *see also* note 11, *supra*. Since plaintiffs' unjust enrichment claim seeks to impose a financial obligation upon defendants based entirely on the transfer of the land pursuant to the Land Disposition Agreement, the Termination Agreement clearly forecloses that claim.[23] This is especially true because the terms of the Termination Agreement are

---

23. Defendants also argue that the concept of unjust enrichment or quasi contract, does not apply where, as here, there is an agreement setting forth the obligations of the parties. *See, e.g.*, Def.Reply Memo. at 13–15; ·Def.Resp.

Memo. at 16–18. However, in view of the Court's determination that plaintiffs' unjust enrichment claim lacks factual support, there is no need for the Court to resolve that issue.

clear and unambiguous and, therefore, may not be modified by parol evidence. *See Locafrance, supra,* 558 F.2d at 1114–15; *Ruskay v. Waddell,* 552 F.2d 392, 395–96 (2d Cir.) *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

■ Finally, the claim of equitable estoppel lacks merit for several reasons. Firstly, as this Circuit has recently held, a claim of equitable estoppel requires a clear and unambiguous promise, upon which plaintiff has reasonably and foreseeably relied to his detriment under circumstances where the defendant could have reasonably believed that plaintiff would rely on that promise. *See Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 264 (2d Cir.1984) (citing *Ripples of Clearview, Inc. v. LeHavre Associates,* 88 A.D.2d 120, 122, 452 N.Y. S.2d 447, 449 (2d Dept.1982)). Here, plaintiffs concede that no such promise was made. *See, e.g.,* Cassan Aff. at ¶¶ 6–9; Martinelli Dep. at 296–97; Del Bello Dep. at 18–20; Scher Dep. at 24–25; 45–48, Yulish Dep. at 38; Dunn Dep. at 85, 87–88, 92–94, 115. Nor does the evidence permit a rational inference that plaintiffs could have reasonably relied on such a promise or that the defendants could have reasonably believed that plaintiffs would rely on such a promise, even assuming *arguendo* that one had been made. The circumstances surrounding the Land Disposition Agreement, and the specific obligations assumed and performed by Otis incident thereto, and the clear language of the Letter of Intent, in which Otis' remaining in Yonkers was set forth as a goal and not a binding obligation, negate any such inference, and demonstrate that plaintiffs cannot sustain their claim of equitable estoppel as a matter of law. *See* 7/9/85 PTC Tr. at 47.

This is especially true since New York law, which is concededly applicable, seriously restricts concepts of equitable estoppel in cases such as this one, involving land transfers and other contracts subject to the Statute of Frauds, particularly where as here, Otis concededly performed all of its obligations under the Land Disposition Agreement. *See, e.g., Huggins v. New Castle Estates, Inc.,* 36 N.Y.2d 427, 432, 330 N.E.2d 48, 53, 369 N.Y.S.2d 80, 86 (1975); *cf. Philo Smith & Co. v. USLIFE Corp.,* 554 F.2d 34, 36 (2d Cir.1977); *Tribune Printing Co. v. 263 Ninth Avenue Realty, Inc.,* 88 A.D.2d 877, 879, 452 N.Y. S.2d 590, 592–93 (1st Dept.1982), *aff'd,* 57 N.Y.2d 1038, 444 N.E.2d 35, 457 N.Y.S.2d 785 (1982); *Swerdloff v. Mobil Oil Corp.,* 74 A.D.2d 258, 263, 427 N.Y.S.2d 266, 270 (2d Dept.), *leave to appeal denied,* 50 N.Y.2d 913, 409 N.E.2d 995, 431 N.Y.S.2d 523 (1980).

In sum, the facts of this case present at best a serious and good-faith effort by plaintiffs and Otis to maintain and continue a long-standing and mutually beneficial relationship which was profitable to Otis and a source of employment for residents of Yonkers. That effort did not succeed. However, crushed hopes and disappointed expectations are not synonymous with the breach of a contractual obligation. Giving the plaintiffs the benefit of every reasonable inference, that is what the evidence at trial will establish. Under those circumstances, the defendants are entitled to summary judgment.

### 4. *The Application for Rule 11 Sanctions*

By Opinion and Order dated June 28, 1985, the Court awarded Rule 11 sanctions against plaintiffs and plaintiffs' counsel based on the fact that plaintiffs' fraud claims, since withdrawn, lacked any colorable factual basis. The Court still believes that position to be correct and adheres to that ruling.

Defendants also seek Rule 11 sanctions with respect to plaintiffs' contract claims. The Court denies that application.

While the Court has concluded that those claims are barred by the Statute of Frauds and, in any event, cannot be legally sustained at trial, the Court cannot conclude that plaintiffs' arguments, and more particularly the claim that the New York case law with respect to implying a reasonable time for the performance of a contract silent as to duration renders the Statute of Frauds inapplicable, are so lacking in legal

support, under either existing law or a rational argument for the extension of existing law, as to warrant the imposition of Rule 11 sanctions. *Cf. Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 253–54 (2d Cir.1985).

While it is true that some of the statements made by one of plaintiffs' officials, *i.e.* Mayor Martinelli, suggest that this action was motivated, at least in part, by a desire to punish and harrass Otis, *see* Mazur Aff. at ¶¶ 2–3, and Exs. A–H attached thereto, those statements are not binding on other plaintiffs. Moreover, even a bad-faith motive does not justify Rule 11 sanctions, where as here, the Court has concluded that the arguments advanced are not lacking in colorable legal support. As the Second Circuit has held, and recently reiterated, Rule 11 sanctions must be assessed in accordance with an objective, rather than a subjective standard of good faith, and the rule is violated only when it is "patently clear that a claim has absolutely no chance of success." *See Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986) (citing *Eastway, supra,* 762 F.2d at 253–54).

## CONCLUSION

The defendants' motion for summary judgment is granted. Defendants' motion for Rule 11 sanctions has been previously granted as to the fraud claim in the amount of $5000.00, to be imposed jointly upon plaintiffs and their counsel, but denied in all other respects. The Clerk of the Court shall enter judgment accordingly.

It is SO ORDERED.