844 F.2d 42
 56 USLW 2630, 10 Fed.R.Serv.3d 1088
 CITY OF YONKERS and Yonkers Community Development Agency,
Plaintiffs- Appellants,
Vito J. Cassan, Esq., Appellant,
v.
OTIS ELEVATOR COMPANY and United Technologies Corporation,
Defendants- Appellees.
 No. 1142, Docket 87-7092.
 United States Court of Appeals,
Second Circuit.
 Argued April 22, 1987.
Decided April 7, 1988.
 
 Vito J. Cassan, New York City, John D. Calamari, Joseph M. Perillo, New York City, of counsel), for plaintiffs-appellants.
 Robert Mazur, New York City (Wachtell, Lipton, Rosen & Katz, New York City, Donald N. Cohen, of counsel), for defendants-appellees.
 Before KAUFMAN, MESKILL and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 This diversity case, acknowledged by all parties to be governed by New York law, arises out of the City of Yonkers' ("Yonkers") attempt to prevent a major employer within its borders, Otis Elevator Company ("Otis"), from moving out of the city. After Yonkers and the Yonkers Community Development Agency (the "Agency") granted Otis various benefits, Otis stayed in the city for a number of years. However, the Otis facility was rendered uneconomical due to technological changes in the manufacture of elevators, Otis' main product. Otis then left the city, ultimately selling the facility to the Port Authority of New York and New Jersey. Yonkers and the Agency then brought suit in the United States District Court for the Southern District of New York seeking damages from Otis and United Technologies Corporation ("United"), Otis' parent. After discovery, the district court, John E. Sprizzo, Judge, granted defendants' motion for summary judgment, and imposed a sanction of five thousand dollars upon plaintiffs and their counsel, Vito J. Cassan, for filing an unjustified fraud claim.
 
 
 2
 We affirm.
 
 Background
 
 3
 Otis was founded in Yonkers in 1853, and continued in business there until 1976. In 1968, Otis' Yonkers plant required modernization and expansion to remain commercially viable. However, expansion appeared impossible due to limited land space, and Otis therefore considered alternatives, some of which involved closing the Yonkers plant.
 
 
 4
 The president of Otis, Ralph Weller, authorized Otis representatives to meet with Yonkers officials to try to solve Otis' space problems. A plan drafted by the Charles T. Main Company was rejected by Otis, but negotiations continued. Otis then formulated its own plan internally, tailored to meet Otis' land and space requirements in Yonkers. This plan recommended the use of urban renewal (with its accompanying provision for condemnation)[1] to allow Otis to expand to the east of the plant. Accordingly, Otis notified Yonkers that if an adjoining parcel of land could be made available, Otis would be willing to expand and modernize its plant. After further negotiation, Otis, Yonkers and the Yonkers Urban Renewal Agency entered into a letter of intent dated June 5, 1972 which provided in relevant part:
 
 
 5
 1) The purpose of this letter and of the commitments set forth herein is the realization of the following goals:
 
 
 6
 a) the retention by Otis of its existing usable manufacturing facilities in Yonkers;
 
 
 7
 b) the improvement and expansion of those facilities with the cooperation and assistance of federal, state and local agencies;
 
 
 8
 c) the improvement in the aesthetic appearance of the older section of Yonkers in which these facilities are located; and
 
 
 9
 d) the continuation of existing opportunities for employment and training of the unemployed and the underemployed, such as are now provided by Otis.
 
 
 10
 The Yonkers City Council adopted an urban renewal plan on September 26, 1972 which included the land in question and set forth a number of goals and conditions, including obligations of Otis. At this point, Yonkers and the Agency began purchasing and clearing the property adjacent to the Otis factory, using funding received from the federal and state government as well as Yonkers' own resources. Otis also invested substantial funds renovating its Yonkers physical plant.
 
 
 11
 On September 13, 1974, the Agency and Otis entered into a land disposition agreement, and the Agency executed an indenture conveying the property adjacent to the Otis factory, which Yonkers had acquired, to Otis. Because most of the obligations between the parties relating to the details of the land transfer and renovation had been completed, on December 29, 1976, the parties entered into a termination agreement, which released the parties from further liability with respect to these obligations. Moreover, the actual redevelopment and construction were substantially completed; on November 3, 1976, the Agency accordingly issued a certificate of completion.
 
 
 12
 By 1982, however, the technology of elevator manufacture had undergone substantial change. The Yonkers plant was used to manufacture three mechanical components. In the early 1980's, two of those three were replaced by electronic components. Accordingly, operation of the Yonkers plant became economically unfeasible, and Otis closed it down in 1982.
 
 
 13
 Yonkers then commenced this action in the United States District Court for the Southern District of New York. None of the agreements or other documents pertaining to this situation includes any specific commitment by Otis to continue production at its Yonkers facility, and obviously there was therefore no specific commitment to do so for any designated period of time. Yonkers contends, however, that under various theories,[2] Otis was obliged to continue in operation in Yonkers "for a reasonable time to be set by law, ... alleged to be at least sixty years." Otis denies any such obligation, and further contends that the New York statute of frauds, N.Y.Gen.Oblig.Law Sec. 5-701 subd. a(1) (McKinney 1978), precludes any relief for Yonkers because the asserted contract between the parties was not to be performed within one year from its making, and the crucial asserted term as to duration was not memorialized in a writing subscribed by Otis.
 
 
 14
 After discovery, the district court issued an opinion, 649 F.Supp. 716 (S.D.N.Y.1986), which determined that the New York statute of frauds applied to the contract alleged in Yonkers' complaint, there was no writing sufficient to satisfy the statute of frauds, and even assuming arguendo that the statute of frauds did not bar plaintiffs' claim, defendants had demonstrated that no rational finder of fact could find for plaintiffs on the facts of this case on either a theory of contract (express or implied), equitable estoppel or unjust enrichment. See id. at 726. Defendants' motion for summary judgment was accordingly granted.[3]
 
 
 15
 The district court also imposed a Rule 11 sanction of five thousand dollars upon plaintiffs and their attorney, Vito J. Cassan, for filing fraud claims that "lacked any colorable factual basis," id. at 735, reaffirming an earlier opinion, 106 F.R.D. 524 (S.D.N.Y.1985), which imposed the sanction upon finding "that the plaintiffs' allegations of fraud had no basis in fact, ... that ... plaintiffs were afforded an ample opportunity to withdraw those allegations and unjustifiably refused to do so," and that "[i]t was only after defendants' motion [for summary judgment] was brought that plaintiffs finally consented to withdraw the fraud claim." Id. at 525. The amount of the sanction was apparently premised upon the cost to defendants of moving to dismiss plaintiffs' fraud claims.
 
 
 16
 This appeal followed.
 
 Discussion
 
 17
 A. Summary Judgment.
 
 
 18
 Our role in reviewing the district court's grant of summary judgment is to determine whether a material issue of fact exists and whether the law was applied correctly below. 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2716, at 654 (2d ed. 1983). Our function in doing so is plenary, in the sense that we apply the same standard as that employed by the trial court pursuant to Fed.R.Civ.P. 56(c). Id. Sec. 2716 (2d ed. Supp.1987); Burtnieks v. City of New York, 716 F.2d 982, 985 (2d Cir.1983). Further, the record must be read in the light most favorable to the party against whom summary judgment was granted. Id. at 985-86. Finally, plaintiffs may not defeat a motion for summary judgment merely by pointing to a potential issue of fact; there must be a genuine issue of material fact. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).
 
 
 19
 Plaintiffs contend that Otis was obligated to remain in the city for "a reasonable time," that in 1982 a reasonable time had not yet passed, and therefore that Otis' withdrawal in that year constituted a breach of contract. Yonkers argues in the alternative that if no contractual liability is found to exist, relief should be provided on the basis of quasi-contract or equitable estoppel.
 
 
 20
 Plaintiffs concede that no express promise to remain for a reasonable time was made by Otis.[4] They argue instead for a promise implied either in fact or in law.
 
 
 21
 Implied terms have been divided into three categories: (1) terms that the parties intended, (2) terms that the parties would have intended had they thought about it and (3) terms that are fair. The first involves a search for the parties' intention, the second involves a search for the parties' hypothetical intention, the third has nothing to do with the parties' intention, except that the court will generally not imply a term in the face of the parties' expressed intent to the contrary.... "Implied in law" or "constructive" terms ... include the second and third categories.
 
 
 22
 Hadjiyannakis, The Parol Evidence Rule and Implied Terms: The Sounds of Silence, 54 Fordham L. Rev. 35, 38 n. 22 (1985) (citations omitted); see Barco Urban Renewal Corp. v. Housing Authority, 674 F.2d 1001, 1007 (3d Cir.1982); Haines v. City of New York, 41 N.Y.2d 769, 772-73, 396 N.Y.S.2d 155, 157-58, 364 N.E.2d 820, 822-23 (1976); Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917); Restatement (Second) of Contracts Sec. 204 comment d (1981).
 
 
 23
 We next apply these criteria to the question presented for our decision. The record shows that the parties bargained to retain Otis' presence, but that the only limit on its subsequent right to leave was economic reality. The deposition testimony of several of the witnesses establishes that Otis would not have agreed to a term requiring Otis to operate its Yonkers facility for a period of time or even for a reasonable time. As Eugene Hull, a vice president of Otis, testified at his deposition:
 
 
 24
 Q: (by the defense) If in the course of negotiations with respect to the letter of intent Yonkers or the Community Development Agency ever requested the inclusion of a provision of a letter of intent which would have provided that Otis could not close or relocate its Yonkers production facilities for more than ten years from the date of the letter of intent, would you have agreed to such a provision?
 
 
 25
 * * *
 
 
 26
 A: No, I would have been reluctant to commit ourselves to any specific period, you know. Whatever it might be, without, you know, a lot of serious consideration.
 
 
 27
 Q: Why is that?
 
 
 28
 A: Well, simply because, you know, there are and would be alternatives to providing production facilities with our other plants in the country, whether to make or buy the equipment that we manufactured there [sic] could have been provided by General Dynamics or General Electric, and we're continually making studies whether we should manufacture or buy.
 
 
 29
 So with the changes in technology going on at the time in the industry, it would be pretty hard to commit yourself.
 
 
 30
 Ralph Weller, Otis' president, and William Granville, an Otis vice president, testified to the same effect.
 
 
 31
 In any event, as stated earlier, there is no contention that the parties specifically agreed that Otis would remain in Yonkers, much less remain for a fixed period of time. Both sides believed, however, that the size of Otis' reinvestment in its Yonkers facility would guarantee the long term presence of Otis in Yonkers. Mr. Weller so testified, as did Alphons Yost, executive director of the Agency, and Alfred DelBello, then Mayor of Yonkers. Yost nonetheless testified that this was a "hope," and "that the length of time that Otis would operate in Yonkers could have been unilaterally determined by Otis."
 
 
 32
 The letter of intent, quoted above, similarly supports this view. That letter contains a clear distinction between "goals" and "commitments." Otis' continuing presence was only a goal, not a commitment. Yonkers argues that this is mere semanticism, and if only one or the other term had appeared, that argument might have some merit. Both were employed, however, and there is a clear difference between them.
 
 
 33
 This distinction and its implications were noted by Brett Auerbahn, the project director of the Agency, who noted in a memorandum analyzing the letter of intent:
 
 
 34
 Has Otis gone any further than stating that it is their goal to remain in Yonkers? There appear to be a great number of sanctions against the City should it fail to meet up to its part of the obligation but no similar sanctions against the Otis Elevator Company.
 
 
 35
 We further note that although Otis drafted the letter of intent, Seymour Scher, then city manager of Yonkers, wrote a letter to Granville in anticipation of the letter of intent which also referred to the retention of Otis as a goal of the project. Moreover, the legal counsel of the Yonkers Department of Development wrote Yost a memorandum analyzing the letter of intent with respect to Otis' obligation to provide employment, which stated that "[f]ailure to meet these goals does not give a legal right to the other parties."
 
 
 36
 Whether one views the resulting situation as negating any limit on Otis' mobility or as creating an implied promise to stay only as long as the plant remained economically feasible, the result is the same. Yonkers does not dispute Otis' professed reason for closing the plant: technological changes in the product and a corresponding change in the manufacturing capability needed to produce that product. In its Rule 3(g) statement[5] of material facts as to which it contended there was no genuine issue to be tried, Otis asserted that two of the three components manufactured at its Yonkers facility were replaced by electronic components and rendered obsolete, Otis was able to satisfy its requirements for the third component from its other plants, and Yonkers production was accordingly terminated because there was no business justification for its continuance. In its responding Rule 3(g) statement, Yonkers stated that Otis' Yonkers facility operated at a profit until it was closed, and that Yonkers "never assumed the risk of Otis's making a poor business judgment with reference to its need or use of its expanded and modernized Yonkers facility," effectively conceding the factual premise for closure of the Yonkers plant asserted by Otis.[6]
 
 
 37
 We conclude that this is not an appropriate case for the imposition of the implied promise for which plaintiffs contend, and that no genuine issue of material fact concerning that question is presented by this record. We refer again to the implied promise which Yonkers must establish to prevail in this litigation: that Otis promised to continue operation of its Yonkers facility for a period which exceeded the duration of its actual continuance; i.e., for a period which extended beyond the time when Otis made an unchallenged determination that there was no business justification, in the light of subsequent technological developments, for continued use of the Yonkers facility.
 
 
 38
 No rational trier of fact could conclude that this was the intention of the parties, which they inadvertently failed to express; or that the parties never considered the duration of Otis' commitment to Yonkers, but would have agreed upon the promise for which Yonkers contends had they done so. Cf. Barco Urban Renewal Corp. v. Housing Authority, 674 F.2d 1001, 1007 (3d Cir.1982) (right of first refusal deemed to continue for a commercially reasonable time where no time explicitly set by contract). Nor can we conclude that this promise must be implied as a matter of fairness, akin to the implication of a covenant of fair dealing. See, e.g., Roli-Blue, Inc. v. 69/70th St. Assoc., 119 A.D.2d 173, 176-78, 506 N.Y.S.2d 159, 161-62 (1st Dep't 1986); E. Farnsworth, Contracts Sec. 7.16, at 524-25 (1982).
 
 
 39
 The implied promise for which Yonkers contends is not only outside the contemplation of the parties, but indeed extraordinary.[7] The fair reading of this situation, it seems to us, is that Yonkers was relying upon, and Otis was deterred from departing by, the very considerable investment Otis made in renovating its Yonkers plant. When compelling business developments overcame that incentive to stay, Yonkers was left with a modernized manufacturing facility which was sold by Otis to another entity and continues to produce at least some jobs and income for Yonkers. However understandable Yonkers' disappointment at Otis' departure may be, it would be an imposition by the court to add an obligation to the contract between the parties which appears manifestly unreasonable on the record before us, rather than an obvious requirement of justice and fair dealing.
 
 
 40
 Our disposition of the contract claim also disposes of the quasi-contractual cause of action, because such relief is unavailable where an express contract covers the subject matter. Stissi v. Interstate & Ocean Transport Co., 814 F.2d 848, 851 (2d Cir.1987); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987); Nixon Gear & Machine Co. v. Nixon Gear, Inc., 86 A.D.2d 746, 746, 447 N.Y.S.2d 779, 781 (4th Dep't 1982); Restatement of Restitution Sec. 107(1) (1937). Because we believe that Otis performed its obligations under the contract, see Restatement of Restitution Sec. 107(1) (1937), no quasi-contractual relief is appropriate.
 
 
 41
 Yonkers' final argument on the merits is that relief based upon equitable estoppel should be provided. It asserts that such relief is available where there is a misrepresentation of fact, reasonable reliance upon that misrepresentation, and injury caused by the reliance. See Triple Cities Construction Co. v. Maryland Casualty Co., 4 N.Y.2d 443, 448, 176 N.Y.S.2d 292, 295, 151 N.E.2d 856, 858 (1958); Rothschild v. Title Guarantee & Trust Co., 204 N.Y. 458, 461-64, 97 N.E. 879, 880-81 (1912); J. Calamari & J. Perillo, Contracts Sec. 11-29(b) (3d ed. 1987). Otis argues that Rothschild and the theory of equitable estoppel have been overruled sub silentio by Huggins v. Castle Estates, Inc., 36 N.Y.2d 427, 369 N.Y.S.2d 80, 330 N.E.2d 48 (1975), and that Yonkers must proceed under a theory of promissory estoppel. That theory requires "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." Ripple's of Clearview, Inc. v. Le Havre Associates, 88 A.D.2d 120, 121-23, 452 N.Y.S.2d 447, 449 (2d Dep't 1982) (citation omitted); see R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 78 (2d Cir.1984) (quoting Ripple's of Clearview as stating the New York rule).
 
 
 42
 We need not decide that question, however, because here there was neither a misrepresentation nor a clear promise, so neither theory is satisfied. Moreover, Yonkers officials were aware of the weakness of their position at the time they contracted, rendering reliance unreasonable. Insofar as Yonkers seeks to imply a restriction on the use of property through equitable estoppel, furthermore, the New York Court of Appeals has admonished courts to apply that doctrine to realty with great caution. Huggins v. Castle Estates, Inc., 36 N.Y.2d 427, 433, 369 N.Y.S.2d 80, 87, 330 N.E.2d 48, 53 (1975).
 
 B. Sanctions
 
 43
 Yonkers originally asserted two causes of action for fraud against Otis. It swiftly became clear that the claims were completely without merit. Though requested to withdraw the claims by Otis, Yonkers waited to withdraw the causes of action until after defendants' summary judgment papers were filed. The district court, upon motion, assessed sanctions pursuant to Fed.R.Civ.P. 11 in the amount of $5,000 for the "needless expense [incurred by defendants] in moving to dismiss plaintiffs' fraud claim." City of Yonkers v. Otis Elevator Co., 106 F.R.D. 524, 525 (S.D.N.Y.1985).
 
 
 44
 Appellate review of Rule 11 sanctions is de novo with respect to whether sanctions should be imposed for groundless pleadings. See Norris v. Grosvenor Marketing Ltd., 803 F.2d 1281, 1288 n. 6 (2d Cir.1986); Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 254 n. 7 (2d Cir.1985). Yonkers asserts that any sanctions are inappropriate, because at the time the fraud claims were initially asserted a reasonable inquiry was made, and it was only after discovery was completed that it became clear that the fraud claims had no basis in fact. See Lane v. Sotheby Park Bernet, Inc., 758 F.2d 71 (2d Cir.1985) (per curiam) (attorneys' fees may be assessed for period of time after the frivolous nature of the claim became apparent).
 
 Rule 11 states in part:
 
 45
 The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
 
 
 46
 Fed.R.Civ.P. 11. Thus, if at the time of their filing the fraud causes of action had no proper basis in fact or law, and under the circumstances, the attorney who signed the complaint should have known that, sanctions are mandatory. Fed.R.Civ.P. 11 advisory committee's note to the 1983 amendment.
 
 
 47
 Yonkers contends that it only became clear that its fraud claims were groundless after discovery. Otis responds that even conceding this point arguendo, Yonkers should not have continued to press the fraud claims at that juncture, thus requiring Otis to move for summary judgment with respect to them. See Lane v. Sotheby Parke Bernet, Inc., 758 F.2d 71 (2d Cir.1985) (per curiam). Yonkers argues in reply that the district judge, by outlining at a pre-trial conference what he expected Yonkers to establish in response to the summary judgment motion on the fraud claims, in effect requested that Yonkers continue to assert those claims to and including the summary judgment stage of the lawsuit.
 
 
 48
 We do not accept this view of the record, which we read as reflecting what Judge Sprizzo wanted to see from Yonkers on the assumption that Yonkers was determined to press its fraud claims, as to which Judge Sprizzo expressed considerable skepticism at the pre-trial conference to which Yonkers directs our attention. Sanctions ordered for the expense of moving to dismiss were therefore appropriate. The sanction imposed by the district court, thus limited, was well within its discretion. We note in this connection that the district court rejected Otis' request for broader sanctions. See City of Yonkers v. Otis Elevator Co., 649 F.Supp. 716, 735-36 (S.D.N.Y.1986).
 
 Conclusion
 
 49
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Adjoining landowners unsuccessfully challenged the resulting condemnations on the basis that they were not for a sufficiently public purpose. See Yonkers Community Development Agency v. Morris, 37 N.Y.2d 478, 373 N.Y.S.2d 112, 335 N.E.2d 327, appeal dismissed, 423 U.S. 1010, 96 S.Ct. 440, 46 L.Ed.2d 381 (1975)
 
 
 [2]
 Yonkers' complaint stated claims of implied contract, quasi contract, breach of contract, "bad faith acceptance" by Otis, "fraudulent retention" by Otis and United, and estoppel
 
 
 [3]
 An earlier motion for summary judgment was also granted, but with leave to replead. See 607 F.Supp. 1416 (S.D.N.Y.1985)
 
 
 [4]
 We do not rely upon the New York statute of frauds as a ground for our affirmance. Defendants never pleaded the statute of frauds, even by amendment, despite the requirement of Fed.R.Civ.P. 8(c) that a responsive pleading "shall set forth" the defense. Even if the district court correctly concluded that the defense was not thereby waived, see 649 F.Supp. at 726 n. 14; but see 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1278, at 341 n. 38 (1969 & Supp.1987), and cases there cited, it is not clear that the New York statute of frauds bars recovery here. See, e.g., Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 575-76, 297 N.Y.S.2d 947, 953, 245 N.E.2d 712, 715 (1969) (implied term as to rate of compensation need not be memorialized in writing); Blye v. Colonial Corp. of America, 102 A.D.2d 297, 298-301, 476 N.Y.S.2d 874, 875-76 (1st Dep't 1984) (same). Accordingly, since there is an adequate alternative ground for affirmance, we do not reach the issue. See Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir.1987)
 
 
 [5]
 Rule 3(g) of the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York requires any motion for summary judgment pursuant to Fed.R.Civ.P. 56 to be accompanied by "a separate, short and concise statement of the material facts as to which the moving party contends there is no issue to be tried," and requires the opposing party to provide a similar statement "of the material facts as to which it is contended that there exists a genuine issue to be tried." Further, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Id
 
 
 [6]
 See supra note 5
 
 
 [7]
 Yonkers highlights the implausibility of its position by asserting in its complaint that Otis was obliged to remain in Yonkers "for a reasonable time to be set by law, ... alleged to be at least sixty years."