**CYBERCHRON CORPORATION, Plaintiff–Appellant/Cross–Appellee, Counter–Defendant,**

v.

**CALLDATA SYSTEMS DEVELOPMENT, INC., Defendant–Appellee/Cross–Appellant, Counter–Claimant.**

**Nos. 1203, 1527, Dockets 93–9034, 93–9076.**

United States Court of Appeals, Second Circuit.

Argued March 17, 1994.

Decided Feb. 1, 1995.

Jeffrey G. Gilmore, Vienna, VA (Michael A. Gatje, Wickwire Gavin, P.C., Vienna, Virginia, Michael F. Maschio, Cowan, Liebowitz & Latman, P.C., New York City, of counsel), for Plaintiff–Appellant/Cross–Appellee, Counter–Defendant.

Richard L. Spinogatti, New York City (Darlene Fairman, Joanne Moore Howell, Shea & Gould, of counsel), for Defendant–Appellee/Cross–Appellant, Counter–Claimant.

Before: MAHONEY, WALKER, and SPROUSE,* Circuit Judges.

MAHONEY, Circuit Judge:

Plaintiff-appellant/cross-appellee, counter-defendant Cyberchron Corporation ("Cyberchron") appeals from a judgment entered September 1, 1993 after a bench trial in the United States District Court for the Eastern District of New York, Arthur D. Spatt, *Judge*, that awarded Cyberchron $162,824.19 for direct labor and materials costs incurred in reliance upon statements and conduct of Calldata Systems Development ("Calldata") which gave rise to a claim of promissory estoppel.

Cyberchron's amended complaint asserted claims for breach of contract, quantum merit, and promissory estoppel. Calldata pled a contractual counterclaim. The district court denied recovery on the contractual claim and counterclaim and the claim for quantum me-

---

* The Hon. James M. Sprouse, of the United States Circuit Court of Appeals for the Fourth Circuit, sitting by designation.

ruit, but ruled that certain representations by Calldata had prompted reasonable reliance by Cyberchron and provided a basis for recovery under a theory of promissory estoppel. The court further ruled that no compensation was owed for expenditures made by Cyberchron prior to the time when Calldata's promises generated sufficient reliance by Cyberchron to cause an estoppel, and that Cyberchron's damages should not include overhead expenditures, lost profits, or shutdown expenses.

We affirm the district court's ruling that Cyberchron was entitled to recover for promissory estoppel, but vacate the judgment of the district court and remand for a redetermination of damages.

## Background

### A. *The Events at Issue.*

The factual background of his case is extensively outlined in *Cyberchron Corp. v. Calldata Systems Development,* 831 F.Supp. 94 (E.D.N.Y.1993), the opinion of the district court supporting the judgment from which this appeal is taken, familiarity with which is assumed. We summarize only the facts material to this appeal. Subject matter jurisdiction in this case is premised upon diversity of citizenship. The parties have plausibly assumed that this case is governed by the law of New York, and we accept that understanding.

Cyberchron is engaged in the business of providing customized computer hardware for military and civilian use. Calldata is a subsidiary of Grumman Data Systems Corp. ("Grumman"). Grumman had a contract with the United States Marine Corps to provide a combat command control system for a Marine Corps defense program known as the Advanced Tactical Air Command Central ("ATACC"). The equipment at issue in this case is a "rugged computer work station," consisting of a video processor, a work station, and a color monitor (the "Equipment") that was to be provided for the ATACC program.

During the years 1989 and 1990, the parties were involved in extended negotiations as a result of which Cyberchron attempted to produce the Equipment. Although Cyberchron ultimately produced some Equipment, none was ever delivered to Calldata or Grumman, and no payment for it was ever made to Cyberchron, resulting in this lawsuit. The key problem precluding contractual agreement was the inability of the parties to agree upon the weight of the Equipment, and the penalties to be assessed against Cyberchron for the delivery of Equipment that exceeded the contractually agreed weight.

The tortuous course of the negotiations between the parties is detailed in the opinion of the district court, see 831 F.Supp. at 96–107, and only the most salient events will be described here. After protracted preliminary negotiations, Grumman delivered a purchase order dated May 15, 1990 to Cyberchron (including subsequent amendments, the "Purchase Order") that set forth a total weight per three-component unit of Equipment of 145 pounds and specified severe penalties for exceeding that weight.

Cyberchron never agreed to the terms of the Purchase Order, but had previously commenced production of the Equipment despite the absence of any agreement regarding the matter. Grumman and Calldata encouraged Cyberchron in that course. Indeed, in a letter to Cyberchron dated June 26, 1990, Grumman "insist[ed]" that Cyberchron continue to perform its "contractually binding obligations" under the Purchase Order.

The Purchase Order included a termination liability provision (the "TLP"), which provided that:

> The maximum amount for which Grumman shall be liable if this purchase order is terminated is $200,000 including termination expenses and change order costs. Any expenditure or obligation by the seller in excess of that amount shall be at the seller's own risk. Seller will not be bound to continue performance hereunder if such performance would cause the amount to be expended, together with a reasonable allowance for profit, to exceed such limitation. Not less than (30) days prior to the time that seller's projected total cost, together with a reasonable allowance for profit, will equal or exceed the said limitation, seller will notify Grumman in writing

and will advise its estimate of additional funding required for the next succeeding 30, 60, and 90 day period[s]. Grumman may, by written notice to the seller, unilaterally (i) increase said amount from time to time (in which event the preceding portions of this clause will apply to such increased amount), and/or (ii) delete this clause in its entirety. Nothing herein contained shall authorize an increase in the price or prices in this purchase order.

By letter dated May 24, 1990, Cyberchron notified Grumman, *inter alia,* that the $200,000 maximum termination liability (the "MTL") had been exceeded and that an additional $500,000 guarantee was needed for the next thirty-day period. In response, Grumman issued a revised Purchase Order on June 15, 1990 that increased the MTL to $700,000. A July 27, 1990 request to increase the MTL to $1,000,000 was denied on the basis that the requested "increase would nearly fully fund the subject Purchase Order and is therefore not justified in light of the proximity of the pending negotiations [scheduled for August 8, 1990]." Grumman's manager of procurement, Calvin Wilhelm, explained that the proximity of the negotiations mattered because "[o]nce the price is determined to be fair and reasonable through negotiation, the purchase order is then converted to firm fixed price purchase, purchase order. The clauses with regard to termination liability and price negotiation are then deleted through the definitization amendment that firms that pricing up." At oral argument, however, Calldata's counsel denied that the TLP becomes irrelevant upon agreement to a firm fixed price purchase order, pointing out that the TLP would thereafter apply in the case of a termination for convenience (if, for example, the Marine Corps terminated the ATACC program).

Cyberchron's director of program management, Howard Paul, testified that it was his understanding that Cyberchron would be entitled to reimbursement in accordance with the TLP "in case the contract comes to an end at the actions of the issuer." Calldata presented testimony that the purpose of the provision was to compensate Cyberchron in the event of a termination for convenience, but not in the case of a cancellation due to default. Paul, on the other hand, claims to have believed that Cyberchron would be reimbursed regardless of how the purchase order was terminated.

The district court made a factual determination, in which we perceive no clear error, that in mid-July 1990 a Grumman representative directed Cyberchron to proceed with production of the Equipment as if there had been agreement on the weight issue, asserting that the terms of the purchase order would be resolved later. In addition, on or about July 30, 1990, Cyberchron submitted a progress payment request in the amount of $495,207.58, representing eighty percent of claimed costs, including overhead charges, incurred by Cyberchron through July 20, 1990. Grumman's business manager, Gerald Glinka, testified that although the purchase order was undefinitized, Grumman would have paid the full amount of this progress payment but for a court order, issued in a suit brought by Digital Equipment Corporation against Grumman and Cyberchron which was eventually dismissed, that barred any payments to Cyberchron by Grumman. The order was subsequently vacated.

Ultimately, agreement between the parties was never achieved. By letter dated September 6, 1990, Calldata directed Cyberchron to show cause within ten days why the Purchase Order should not be terminated. Cyberchron's detailed response dated September 13, 1990 was rejected by Calldata in a letter dated September 25, 1990, in which Calldata "terminate[d] the [Purchase Order] for default effective immediately."

The district court determined, in findings that are not clearly erroneous, that Grumman had commenced negotiations with alternate suppliers of the Equipment in August 1990, and entered into a contract with Codar Technology, Inc. dated September 26, 1990 for equipment "which Grumman conceded was inferior to the Cyberchron equipment and weighed more, according to [a Grumman witness] (Tr. at pp. 1100, 1131)." 831 F.Supp. at 106.

## B. *The Ruling of the District Court.*

The district court found that no enforceable agreement ever existed because there was no agreement on "two of the most essential, material and substantial terms of the proposed contract, namely, the weights of the three components [of the Equipment] and the weight penalties." 831 F.Supp. at 109. As a result, Cyberchron's contract claim and Calldata's contractually based counterclaim were dismissed. *Id.* Cyberchron's claim of quantum meruit was also dismissed "[i]n view of the lack of any benefit to the defendant, the failure by the plaintiff to fully perform, and the absence of any unjust enrichment by the defendant." 831 F.Supp. at 112. Neither party appeals any of these dismissals.

However, the District Court found that because of the mid-July 1990 representations and promises that had been made to Cyberchron, Cyberchron was entitled to reliance damages of $162,824.10 for out-of-pocket labor and materials costs incurred after July 15, 1990 and before the termination of negotiations on September 25, 1990, under a theory of promissory estoppel. *See* 831 F.Supp. at 112–20.

The court denied any recovery for lost profits, or for administrative and general overhead, *see id.* at 117–18, but allowed prejudgment interest from December 18, 1990, the date of the commencement of this litigation. *See id.* at 118–19. The court did not address the issue of "shutdown" expenses occurring after September 25, 1990.

This appeal and cross-appeal followed.

## Discussion

On appeal, Cyberchron contends that the TLP provides a separate ground on which it is entitled to a recovery from Calldata. Calldata contests this claim, and argues that Cyberchron's claim for promissory estoppel was improperly allowed. Cyberchron defends the validity of that claim, and argues that its damages for promissory estoppel were inappropriately limited. We consider these issues in turn.

## A. *Recovery on the TLP.*

The district court concluded that the evidence warranted recovery only under a theory of promissory estoppel. In the discussion of those promises upon which it predicated the liability determination, however, the district court did not separately address the impact, if any, of the TLP. The district court's only mention of the TLP was that it was amended to increase the MTL from $200,000 to $700,000, but not amended to increase the MTL to $1,000,000. *See* 831 F.Supp. at 99, 102.

Cyberchron argues on appeal that the TLP provides a separate basis for recovery. Calldata responds that this claim was not presented below, but we reject this contention. Among other things, Cyberchron's witness Paul explicitly testified concerning his view that the TLP provided a basis for recovery if Cyberchron was terminated for any reason.

We do not regard the TLP, however, as providing any separate ground for recovery by Cyberchron. The TLP applies, by its terms, only "if this purchase order is terminated," and accordingly appears to be premised upon the Purchase Order's initially becoming a valid contract. As the district court correctly concluded, this never occurred because the parties never reached agreement regarding the material terms of weights and weight penalties.

Further, the TLP explicitly provided that: "Grumman may, by written notice to [Cyberchron], unilaterally . . . (ii) delete this clause in its entirety." It is difficult to perceive how Cyberchron could ever place any reasonable reliance upon the TLP in view of this provision, or could reasonably conclude that a unilaterally terminable clause could impose upon Calldata or Grumman an obligation to reimburse Cyberchron's costs if the negotiations failed.

Finally, because agreement was never reached regarding the Purchase Order, of which the TLP was a part, the TLP could only provide a separate basis for recovery under a theory of promissory estoppel. As will appear, however, the first element of promissory estoppel is a clear and unambiguous promise. As the preceding discussion

makes clear, the TLP does not satisfy this requirement.

### B. *Promissory Estoppel.*

"In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989) (quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir.1986)); *see also Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824, 833 (2d Cir. 1994); *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48–49 (2d Cir.1988); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 264 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Elvin Assocs. v. Franklin*, 735 F.Supp. 1177, 1182 (S.D.N.Y.1990); *Ripple's of Clearview, Inc. v. LeHavre Assocs.*, 88 A.D.2d 120, 122, 452 N.Y.S.2d 447, 449 (2d Dep't), *appeal denied*, 57 N.Y.2d 609, 442 N.E.2d 1277, 456 N.Y.S.2d 1026 (1982); *James King & Son, Inc. v. DeSantis Constr. No. 2 Corp.*, 97 Misc.2d 1063, 1066, 413 N.Y.S.2d 78, 81 (Sup.Ct.1977).

■ As noted by Judge Spatt, an unconscionable injury is sometimes required to fulfill the third requirement. *See* 831 F.Supp. at 112; *see also Aquilio v. Police Benevolent Ass'n of New York State Troopers, Inc.*, 857 F.Supp. 190, 199 (N.D.N.Y. 1994); *In re Gulf Oil/Cities Serv. Tender Offer Litig. (W. Alton Jones Found. v. Chevron U.S.A. Inc.)*, 725 F.Supp. 712, 734 (S.D.N.Y.1989). *But see Jacobs v. Carsey–Werner Distribution, Inc.*, No. 93 Civ. 6825 (LMM), 1994 WL 116077, at *4 (S.D.N.Y. Mar. 30, 1994) (unconscionability required only when promissory estoppel asserted to contravene effect of Statute of Frauds); *cf. Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 825–26 (2d Cir.1994) (unconscionable injury required for promissory estoppel to negate Statute of Frauds), *cert. denied*, —— U.S. ——, 115 S.Ct. 737, 130 L.Ed.2d 639 (1995); *Philo Smith & Co. v.*

*USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir.1977) (per curiam) (same); *Rosenthal v. Kingsley*, 674 F.Supp. 1113, 1125 (S.D.N.Y.1987) (same).

■ In addition, some courts will apply the doctrine only when enforcement is necessary to avoid injustice. *See Werner v. Xerox Corp.*, 732 F.2d 580, 582–83 (7th Cir.1984) (citing *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965)); *see also* Restatement (Second) of Contracts § 90 (1981). In any event, as will appear, we regard the injury inflicted upon Cyberchron as unconscionable, and believe that injustice can be avoided in this case only by invoking the doctrine of promissory estoppel on Cyberchron's behalf.

Judge Spatt expressly found that Calldata pressured Cyberchron to produce the Equipment, and "assured Cyberchron [in August 1990] that if it did the work, the negotiation problem could be resolved." 831 F.Supp. at 103. The district court also found that in mid-July 1990, Grumman's Wilhelm directed Cyberchron's Paul "to proceed 'as if the new set of weights was approved ... and we would work out the definitization of the purchase order later.'" *Id.* at 102 (quoting Paul testimony, alteration in district court opinion). Later, when Paul asked Wilhelm to put this reassurance in writing, Wilhelm refused. *Id.* at 114. Paul then stated that: "'If I have your assurance that we will resolve the issues in the very near future ...—we will proceed.'" *Id.* (quoting Paul testimony, alteration added). Wilhelm responded: "'[Y]ou should proceed.'" *Id.* (quoting Paul testimony).

After an August 8, 1990 meeting, Robert C. Drost, Grumman's director of material, took over the Cyberchron negotiations. *Id.* at 103. Drost assured Paul that "'everything would be fine'" but insisted that Cyberchron had to "'keep pushing, keep performing ... to maintain the schedule.'" *Id.* at 105 (quoting Paul testimony, alteration in district court opinion). Drost testified that Cyberchron "'had th[e] responsibility and obligation'" to "'continue performing,'" and that "'[o]ne can assume'" that Cyberchron would be paid for that continued performance. *Id.* (quoting Drost testimony). The

district court found that between August 8 and August 28, 1990, Paul was in constant conversation with Grumman personnel, all of whom demanded that Cyberchron continue to manufacture and deliver the Equipment " 'as if the weights were approved.' " *Id.* at 114 (quoting Paul testimony). We have no basis to conclude that the trial judge's evaluation of this developing scenario was clearly erroneous. *See* Fed.R.Civ.P. 52(a).

We accordingly accept the district court's determination that starting in mid-July, there was (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance thereon, and (3) an unconscionable injury, resulting in injustice that could be remedied only by invoking the doctrine of promissory estoppel. In sum, we agree with Judge Spatt's assessment that:

> Grumman's conduct exerting pressure on Cyberchron to produce the units at great expense, and then abruptly terminating the transaction to purchase heavier, inferior equipment at a later date from another company, was unconscionable. At the same time that Grumman was pressuring Cyberchron to produce, with the promise of payment, it was already negotiating with another company to do the work.

831 F.Supp. at 116.

■■■ We reject, however, Cyberchron's argument that promissory estoppel recovery should be extended to the periods prior to mid-July 1990. We are unprepared to conclude that the commitments made at that juncture should be interpreted to validate recovery of the expenses incurred by Cyberchron prior to any promise sufficient to undergird Cyberchron's claim of promissory estoppel. We also reject Calldata's contention that damages can only be awarded for the period following August 28, 1990, the date by which the Purchase Order called for delivery of the Equipment, on the theory that all prior promises were conditioned upon timely delivery of the Equipment. The district court did not read Calldata's commitments as limited in this way, and we perceive no clear error in the court's interpretation of these facts.

Calldata cites *Swerdloff v. Mobil Oil Corp.,* 74 A.D.2d 258, 427 N.Y.S.2d 266 (2d Dep't),

*appeal denied,* 50 N.Y.2d 803, 409 N.E.2d 1003, 431 N.Y.S.2d 1025, 50 N.Y.2d 913, 409 N.E.2d 995, 431 N.Y.S.2d 523 (1980), to establish that promissory estoppel is not available to provide a recovery for Cyberchron. *Swerdloff* asserted that promissory estoppel is applied in two categories of cases: as a substitute for consideration (the situation here), and as a bar to the assertion of the Statute of Frauds (the *Swerdloff* situation). *Id.,* 74 A.D.2d at 261–62, 427 N.Y.S.2d at 268–69. In a dictum addressed to the first category, *Swerdloff* said:

> [P]romissory estoppel is resorted to as a substitute for consideration, ... [as] expressed by section 90 of the Restatement of Contracts Second.... [, which] states:
>
> > "Promise Reasonably Inducing Action or Forbearance
> >
> > "(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."
>
> However, the doctrine expressed in section 90 has not been the law of New York, with narrow exceptions based on unusual circumstances [*].

---

[*] These have been charitable contributions; marriage settlements; a promise of a gift of land followed by the "donee" making substantial improvements thereon; a gratuitous bailee's promise to insure the bailed goods; and a promise by an insurance broker to pay certain premiums to prevent lapse of the policy.

74 A.D.2d at 261 & n. [*], 427 N.Y.S.2d at 268 & n. [*] (citations omitted).

Approximately two years after it decided *Swerdloff,* however, the Second Department decided *Ripple's,* and stated the New York law of promissory estoppel in the terms described earlier in this opinion without any intimation that the doctrine should be limited to the factual scenarios outlined in the *Swerdloff* footnote. *Swerdloff* has accordingly never been cited by this court as stating the New York rule of promissory estoppel, while *Ripple's* has repeatedly been invoked

for that purpose. *See City of Yonkers*, 844 F.2d at 48–49; *R.G. Group*, 751 F.2d at 78; *Reprosystem, B.V.*, 727 F.2d at 264; *see also Murphy v. Gutfreund*, 583 F.Supp. 957, 966 ("[N]either the New York Court of Appeals, nor any other New York State court has adopted the *Swerdloff* view of promissory estoppel.... [T]he Second Circuit does not limit its application of promissory estoppel as a 'consideration-substitute' to *Swerdloff's* narrow categories.") (footnotes omitted).

In sum, we conclude that *Ripple's*, rather than *Swerdloff*, states the New York rule regarding this issue, and that Cyberchron proved its promissory estoppel case in accordance with the requirements of *Ripple's*.

### C. *Damages*.

Based upon documentary evidence, the district court awarded Cyberchron "reliance damages" for materials purchased in the amount of $53,588.40 and labor costs incurred in the amount of $109,235.79 between July 15 and September 25, 1990, totalling $162,824.19. 831 F.Supp. at 118. The court specifically declined to provide any award for administrative or engineering overhead on the bases that: (1) these expenses were not proved to have been specifically incurred for the Grumman/Calldata transaction; (2) Cyberchron offered proof of overhead expenses for the six months ended June 30, 1990 rather than the period July 15—September 25, 1990; and (3) the overhead expenses were not proper "reliance damages" but rather were speculative and conjectural. 831 F.Supp. at 117–18. In addition, no award was provided for "shutdown" expenses occurring after September 25, 1990.

"Prevailing on a promissory estoppel claim ... sometimes entitles a party only to its out-of-pocket expenses, rather than to benefit-of-the-bargain damages." *Arcadian Phosphates*, 884 F.2d at 73 (collecting authorities); *see also Esquire Radio*, 804 F.2d at 794 (affirming jury award that limited damages to out-of-pocket expenses). The district court correctly noted that "[t]he damages recoverable in a promissory estoppel

case are sometimes referred to as 'reliance damages,' namely, the actual expenditure made in preparation for performance or in performing the work which has been induced by the defendant-promisor." 831 F.Supp. at 116; *see also Restatement (Second) of Contracts* § 349 (1981).

■ *Cyberchron* does not contend for benefit-of-the-bargain damages on this appeal, but argues that it should have been awarded overhead and "shutdown" expenses. Neither party points to any controlling New York law regarding when overhead costs are recoverable. The Seventh Circuit, applying Texas law, has held that to recover overhead cost on a reliance theory, the party making the claim must establish a reasonable probability that it would have covered that portion of its overhead costs by means of another project. *Autotrol Corp. v. Continental Water Sys. Corp.*, 918 F.2d 689, 694–95 (7th Cir.1990). We believe that a more workable rule would be to allow recovery of reasonable overhead costs when it is shown that there is a demonstrable past history of ongoing business operations,[1] without requiring proof that a specific alternative project would have absorbed the overhead costs at issue. *Cf. id.* at 695 ("A lower burden might ... be justified by a desire to simplify litigation to the ultimate benefit of both plaintiffs and defendants.").

If such a showing can be made in this case, we see no reason for a blanket bar against the recovery of reasonable overhead expenses as long as they are normally allocated to specific projects in accordance with Cyberchron's standard cost accounting practices. Indirectly incurred expenses such as those relating to overhead are both actual and out-of-pocket. The most significant distinction between overhead and direct costs is the ease with which the costs can be traced to a specific project. Since overhead expenses are incurred to facilitate multiple projects, some rational approximation must be used to allocate the overhead. Nearly every business incurs overhead expense and allocates them to projects for both pricing and managerial accounting purposes. Indeed, the ne-

---

1. Consistently with this view, we regard proof of overhead allocations and expenses for the six months ended June 30, 1990 as providing an adequate basis for the determination of overhead expenses for the period July 15—September 25, 1990.

gotiations between the parties in this case included very precise evaluations of applicable overhead rates.

Cyberchron urges that we also permit recovery of shutdown costs, which were of course incurred only after termination of negotiations between the parties and therefore outside the July 15—September 25, 1990 time frame established by the district court for damages. To the extent that these costs were incurred due to reliance upon the Call-data promises that provide the basis for a promissory estoppel, shutdown costs should be allowed. However, some of the shutdown costs are undoubtedly attributable to actions undertaken by Cyberchron prior to July 15, and may not be recovered.

## Conclusion

We affirm the judgment of the district court insofar as it allowed recovery to Cyberchron on a theory of promissory estoppel, but vacate the judgment and remand for a redetermination of damages in accordance with this opinion. The district court may elect to take additional proof or to decide the issue on the present record.

